## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| MICHAEL PORTER, an individual, individually and on behalf of all others similarly situated, | ) ) ) | Case No. 3:21-cv-00529 |
| Plaintiffs, | ) ) | **CLASS AND COLLECTIVE ACTION COMPLAINT** |
| vs. | ) ) | |
| T&T FARMS, INC., an Indiana Corporation; and THOMAS HALLECK, JR., an individual, | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) ) | |

## <u>INTRODUCTION</u>

1.      This class action lawsuit is brought against trucking company T&T Farms, Inc. ("T&T Farms") and its owner Thomas Halleck, Jr. (Halleck), and arises out of T&T Farms' "lease-driver" business opportunity program (the "Driving Opportunity") whereby certain of its truck drivers ("Drivers") leased trucks from T&T Farms and simultaneously agreed to provide driving services to T&T Farms utilizing such trucks.  Drivers are licensed commercial drivers responsible for safely operating a commercial vehicle and transporting T&T Farms' customers' cargo.

2.      Plaintiff Michael Porter (hereinafter, "Porter") and the members of the putative Class ("Drivers") are current and former Drivers for T&T Farms.

3.      When selling the Driving Opportunity to Drivers, T&T Farms made uniform factual misrepresentations and failed to disclose material facts about the economics of the Driving Opportunity, the income, and the overall material terms and conditions the Driving

Opportunity did and would provide in order to induce Drivers to purchase the Driving Opportunity.  T&T Farms thus defrauded the Drivers into paying for the bulk of the expenses of transporting goods for T&T Farms' customers including such items as truck lease payments, trailer lease payments, gas, maintenance, computers, insurance, and other expenses associated with the Driving Opportunity. After paying such expenses, the Drivers often had little or no compensation or sometimes even owed T&T Farms money despite the long hours they worked as Drivers.

4.     In connection with the offer, sale, and/or operation of the Driving Opportunity, T&T Farms and/or Halleck have (1) violated the federal Truth-in-Leasing Regulations, 49 C.F.R. § 376.1 et seq. (made actionable under the Motor Carrier Act under 49 U.S.C. §14704 et seq.); (2) violated the Indiana Business Opportunity Transactions Act,  Ind. Code § 24-5-8-1 et seq.; (3) violated the Indiana Wage Payment Statute, Ind. Code § 22-2-5-2 et seq.; (4) violated the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201, *et seq.*; (5) committed constructive fraud; and (6) breached the applicable contracts and implied covenant of good faith and fair dealing.

5.     Porter was a Driver from approximately March 2020 to early February 2021. Porter seeks to certify an appropriate class action under Rule 23 of the Federal Rules of Civil Procedure that will assert claims under laws of the Indiana and a collective action under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*

6.     Porter seeks damages, declaratory, equitable, and injunctive relief, as well as available attorneys' fees and costs on behalf of himself and the Drivers.

**JURISDICTION AND VENUE**

7.      This Court has original subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331 because the claims herein arise under laws of the United States, the FLSA, 29

U.S.C.§ 201 et seq., and the Motor Carrier Act, 49 U.S.C. §14704, et seq. This Court has

supplemental jurisdiction over Named Plaintiffs' state law claims because those claims arise

out of the same nucleus of operative fact as the federal claims.

8.      This Court also has jurisdiction over this action pursuant to the Class Action

Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), because the aggregated claims of the

putative class members exceed the sum value of $5,000,000, exclusive of interests and costs,

and this is a class action in which at least one member of the putative Class, on the one hand,

and Defendant, on the other, are citizens of different states.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as T&T

Farms has its headquarters and offices, conducts business, and can be found in the District,

and a substantial part of the events or omissions giving rise to Porter's claims occurred in this

judicial district. Venue is further proper under 29 U.S.C. § 1132(e)(2) because T&T Farms

has substantial business contacts within the state of Indiana and in this District.   Halleck is

also a resident of the District.

**PARTIES**

10.     Plaintiff Michael Porter is a resident of the State of Michigan.

11.     Porter performed work as a Driver for T&T Farms from approximately March

2020 to February 2021.  Porter regularly engaged in T&T Farms' business in various locations,

including within this judicial district.

12.     Porter is informed, believes, and thereon alleges that T&T Farms is an Indiana corporation with its principal place of business in Winamac, Indiana.  During the relevant time period, T&T Farms was and is engaged in business throughout the United States, including in Indiana.  T&T Farms' primary business consists of providing transportation services to various clients.

13.     Porter is informed, believes, and thereon alleges that Thomas A. Halleck Jr. is an Indiana resident with his primary place of business in Winamac, Indiana.  During the relevant time period, Halleck was and is engaged in business throughout the United States, including in Indiana.  Halleck is the president and a primary owner of T&T Farms.

## GENERAL ALLEGATIONS

14.     During the time period relevant to this action, T&T Farms has employed Drivers to provide long haul delivery services to T&T Farms' customers.  Drivers work regular schedules for T&T Farms, often 6-7 days per week, and 11-14 hours per day, in order to meet T&T Farms' service and stand-by demands. As a result, it is impracticable for Drivers to take on any other employment outside of T&T Farms.

15.     In order to induce Drivers to purchase the Driving Opportunity and defraud them out of their labor and money, T&T Farms and Halleck, from its headquarters in Indiana, directed and implemented a multi-pronged fraudulent scheme.  The initial stage of the scheme involved false and misleading telephonic representations made by Halleck and others to prospective Drivers describing the Driving Opportunity as a "lease program" and that Drivers for T&T Farms had average net weekly earnings of between $1,200 and $1,500 per week.  In Porter's case, in about February of 2020, Halleck had a phone call with Porter in which Halleck told Porter that T&T Farms' offered a "lease-purchase" program where a driver leased

a truck from T&T Farms, and would own it at the end of the lease, and that drivers who drove for T&T Farms under the program in fact averaged a net income between $1,200 and $1,500 per week.

16.     The scheme also involved T&T Farms and Halleck concealing that Drivers actually had average net weekly earnings well below $1,200 to $1,500, that there was a high turnover rate for T&T drivers, that Drivers rarely if ever lasted long enough to own the trucks, and that T&T Farms did not and would not comply with federal Truth-in-Leasing regulations requiring written leases and disclosures of other key information pertinent to Drivers' compensation and terms and conditions of engagement.  In Porter's case, Halleck made no such disclosures in the February 2020 phone call.

17.     The goal of these initial communications was to get Drivers to come to T&T Farms' facility in Indiana to purchase the Driving Opportunity and begin driving for T&T Farms. With the hook set by false and misleading information and omissions, Porter and all other Drivers relied on the same and travelled to T&T Farms' facility in Indiana to purchase the Driving Opportunity.  Once there, while Drivers were physically present in Indiana at T&T Farms' premises, T&T Farms and Halleck subjected all Drivers to the same commons script that include the same or similar income representations and touting the benefits of the Driving Opportunity.  At the same time, T&T Farms and Halleck concealed the above noted important material facts involving low income, high turnover, and the rarity of Drivers ever owning the trucks.

18.     T&T Farms and Halleck engaged in the fraudulent scheme described above to induce Drivers into purchasing the Driving Opportunity.

19.     Drivers relied upon T&T Farms' and Halleck's misrepresentations and omissions and each Driver did purchase the Driving Opportunity while physically present in Indiana. Had Porter and the other Drivers known the truth, they would not have purchased the Driving Opportunity.

20.     Once in the Driving Opportunity, Drivers were financially dependent upon and controlled by T&T Farms.  T&T Farms had the right to control Drivers, because, among other things, T&T Farms decided the rates drivers will be paid and the customer loads they will transport, and Drivers were unable to work for others since T&T Farms had the exclusive possession, control and use of each Drivers' vehicle during the term of the lease and the Drivers were required to be available for service upon demand of T&T Farms.

21.     T&T Farms and Halleck represented to all Drivers that it would pay Drivers compensation in an amount equal to ninety percent (90%) of the gross monies paid to T&T Farms by its shipping customers and, upon information and belief, it has failed to pay Drivers the full promised 90% of the actual gross revenue that T&T Farms received from customers.

22.     T&T Farms charged Drivers by way of deductions or set offs against their compensation for purported Workers' Compensation/Occupational insurance premiums and, upon information and belief, T&T Farms improperly charged the Drivers more than T&T Farms actually paid for such coverage on their behalf.

23.     T&T Farms charged Drivers by way of deductions or set offs against their compensation for various types of other insurance (liability, collision, etc. ) and, upon information and belief, T&T Farms improperly charged the Drivers more than T&T Farms actually paid for such insurance coverages.

24.     T&T Farms charged Drivers by way of deductions or set offs their compensation for tolls and, upon information and belief, T&T Farms improperly charged the Drivers more than T&T Farms actually paid for tolls.

25.     T&T Farms charged Drivers by way of deductions or set offs against their compensation for fuel and, upon information and belief, T&T Farms improperly charged the Drivers more than T&T Farms actually paid for fuel and/or failed to pass along discounts and fuel surcharges collected.

26.     T&T Farms charged Drivers by way of deductions or set offs against their compensation for fuel tax and, upon information and belief, T&T Farms improperly charged the Drivers more than T&T Farms actually paid for fuel tax.

27.     T&T Farms charged Drivers by way of deductions or set offs against their compensation for Electronic Fund fees (EFS charges) and, upon information and belief, T&T Farms improperly charged the Drivers more than T&T Farms actually paid for EFS charges.

28.     T&T Farms charged Drivers by way of deductions or set offs against their compensation for compensation to T&T Farm's dispatchers without the Drivers' authorization.

29.     T&T Farms charged Drivers by way of deductions or set offs against their compensation for truck and trailer maintenance escrows without authorization and in excessive amounts.

30.     T&T Farms charged Drivers by way of deductions or set offs against their pay miscellaneous additional expenses without authorization and in excessive amounts.

31.     T&T Farms collected fuel surcharges from shipping customers which it was supposed to pass along to the Drivers but, upon information and belief, T&T Farms improperly retained all or part of those surcharges despite the Drivers incurring the cost of fuel.

32.     Upon information and belief, T&T Farms has employed in excess of two hundred Drivers in the past 6 years.

33.     In sum, T&T Farms and Halleck concealed that the entire Driving Opportunity was a fraudulent scheme designed to bilk the Drivers out of their labor and to have the Drivers pay T&T Farms' unreasonable and/or inflated expenses associated with transporting goods. T&T Farms' and Halleck's motives in perpetuating the scheme were to cut expenses, increase margins on the money T&T Farms makes selling transportation services, and increase its ability to sell transportation services by pricing below competitor trucking companies that pay drivers and expenses in a lawful fashion.

## COLLECTIVE ACTION ALLEGATIONS UNDER THE FLSA

34.     Porter brings his FLSA claims as a collective action pursuant to 29 U.S.C. § 216(b) as to claims for minimum wage violations, liquidated damages, and attorneys' fees and costs under the FLSA.  The FLSA Collective that Porter seeks to represent is defined as follows:

> All current and former Drivers who were employed by T&T Farms to provide transportation services within the United States at any time during the period beginning three years prior to the filing of this Complaint and continuing through the certification of and notice to the Collective.

35.     Porter's claims for violations of the FLSA may be brought and maintained as an "opt-in" collective action pursuant to Section 216(b) of the FLSA, because Porter's FLSA claims are similar to the claims of the Collective members.

36.     The Collective members are similarly situated, as they have substantially similar job duties and requirements and are subject to a common policy, practice, or plan that misclassifies them as exempt independent contractors, and thus requires them to perform work without compensation in violation of the FLSA.

37.     Porter is representative of the Collective members and is acting on behalf of their interests, as well as Porter's own interests, in bringing this action.

38.     Porter will fairly and adequately represent and protect the interests of Collective members.  Porter has retained counsel competent and experienced in employment class action and collective action litigation.

39.     The similarly situated Collective members are known to T&T Farms, are readily identifiable, and may be located through T&T Farms' records.  These similarly situated employees may readily be notified of this action, and allowed to "opt-in" to this case pursuant to 29 U.S.C. § 216(b) for the purpose of collectively adjudicating their claims for unpaid wages, liquidated damages (or, alternatively, interest), and attorneys' fees and costs under the FLSA.

## CLASS ACTION ALLEGATIONS UNDER FED. R. CIV. P. 23

40.     Porter seeks to maintain his Indiana state law claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  In particular, Porter seeks to certify the following Rule 23 Class:

> All current and former Drivers who leased trucks and drove for T&T Farms and had deductions taken from their compensation for a truck lease payment in any week within the United States at any time during the period beginning six years prior to the filing of this Complaint, and continuing through the resolution of this action.

41.     Excluded from the Rule 23 Class are T&T Farms, T&T Farms' legal representatives, officers, directors, assigns and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in T&T Farms; the Judge(s) to whom this case is assigned and any member of the Judge's immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Rule 23 Class.

42.     Porter seeks to serve as a Class Representative for the above-defined Class.

43.     Porter's Indiana state law claims have been brought and may properly be maintained as a class action under Rule 23 because there is a well-defined community of interest in the litigation and the putative Class is easily ascertainable.

44.     Numerosity:  The potential members of the Class are believed to exceed 100, and the Class Members are so numerous that joinder of all members is impracticable.

45.     Commonality:  There are questions of law and fact common to Porter and the Class that predominate over any questions affecting only individual members of the Class. Examples of these common questions of law and fact include, without limitation:

      a.   Whether T&T Farms in the offer, sale, and/or operation of the Driving Opportunity violated the federal Truth-in-Leasing Regulations, 49 C.F.R. § 376.1 et seq. (made actionable under the Motor Carrier Act under 49 U.S.C. §14704 et seq.) and whether Halleck unlawfully aided, abetted, encouraged, and/or required T&T Farms to violate such regulations in derogation of 49 C.F.R. §390.13;

      b.   Whether T&T Farms and Halleck in the offer, sale, and/or operation of the Driving Opportunity violated the Indiana Business Opportunity Transactions Act,  Ind. Code 24-5-8-1 et seq. by failing to register, failing to make required disclosures, and misrepresenting 1) that Drivers purchasing the Driving Opportunity would have a career opportunity, 2) that the Driving Opportunity would provide a sustained and viable economic opportunity, 3) the amount of income for Drivers would earn, and/or 4) by concealing material facts including the high turnover and failure rates of Drivers, the low

average income of Drivers, and the low average driving miles T&T Farms provided to Drivers, as well as excessive charges/deductions that T&T Farms would impose on Drivers;

c.   Whether T&T Farms misclassified Drivers as independent contractors under, and violated, the Indiana Wage Payment Statute, Ind. Code § 22-2-5-2 et seq. by making unauthorized deductions from Drivers' compensation;

d.   Whether T&T Farms and Halleck committed constructive fraud by misrepresenting income Drivers would earn, misrepresenting  the nature of the economic opportunity being offered, and concealing material facts including the high turnover and failure rates of Drivers, the low average income of Drivers, the low average miles T&T Farms provided to Drivers, and the excessive and inflated charges to Drivers;

e.   Whether T&T Farms breached the applicable contracts and implied covenant of good faith and fair dealing, including whether T&T Farms paid the Drivers the correct amounts, whether T&T Farms took improper set-offs or deductions from payments due the Drivers, whether T&T Farms should have reimbursed the Drivers  for certain of their business expenses, and whether T&T Farms charged excessive and improperly inflated expenses to Drivers;

f.   The nature and extent of class-wide injury and the measure of damages for those injuries; and

g.   The proper formula and methodology for calculating restitution, damages and penalties owed to Porter and the Drivers as alleged herein.

46.    Typicality:  Porter's claims are typical of the claims of the Drivers.  T&T Farms' common course of unlawful conduct as alleged herein has caused Porter and Drivers to sustain the same or similar injuries and damages.  Porter's allegations – both legal and factual – are thereby representative of and co-extensive with the claims of the Drivers.

47.    Adequacy:  Porter does not have any conflicts of interest with members of the Class of Drivers he seeks to represent, and Porter will prosecute this case vigorously on behalf of the Drivers.  Porter's Counsel are competent and experienced in litigating consumer and complex commercial class actions.  Porter will fairly and adequately represent and protect the interests of the Class he seeks to represent.

48.    Superiority of Class Action:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all Drivers is not practicable, and questions of law and fact common to the Class of Drivers predominate over any questions affecting only individual Drivers.  Each Driver has been damaged and is entitled to recovery by reason of T&T Farms' illegal practices and violations of law stated in this complaint.  Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

49.    Porter knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

### FIRST CLAIM FOR RELIEF

**Violation of The Truth-in-Leasing Regulations**
**49 C.F.R. §376 et seq. and 49 U.S.C. §14704**
**(Porter and the Drivers v. T&T Farms and Halleck)**

50.    Porter re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

51.     Under federal law and regulations, "authorized motor carriers" such as T&T Farms may perform authorized transportation in leased equipment *only* if the equipment lease is in *written* form meeting the requirements set forth in the federal Truth-in-Leasing Regulations at 49 C.F.R. § 376.12.  See 49 C.F.R. § 376.11.

52.     The federal Truth-in-Leasing Regulations were passed "to prevent large carriers from taking advantage of individual owner-operators due to their weak bargaining position." *Port Driver s Federation 18, Inc. v. All Saints Express, Inc*., 2009 WL 3234589 *2 (D.N.J. September 28, 2009).

53.     At all times material herein, T&T Farms was a motor carrier operating in interstate commerce and required to comply with Truth-in-Leasing Regulations under 49 CFR § 376.

54.     At all times material herein, T&T Farms was an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a) and a "lessee" within the meaning of 49 C.F.R. § 376.2(g).

55.     At all times material herein, Porter and the Drivers operated their trucks to the exclusion of all other persons.

56.     At all times material herein, the Drivers were "owners" within the meaning of 49 C.F.R. § 376.2(d), and "lessors" within the meaning of 49 C.F.R. § 376.2(t).

57.     At all times material herein, the arrangement between T&T Farms and the Drivers was a "lease" within the meaning of 49 C.F.R. § 376.2 (e) wherein the Drivers granted use of the equipment to T&T Farms for use in the regulated transportation of property, in exchange for compensation.

58.     At all times material herein, the truck and trailer leased to T&T Farms by the Drivers were "equipment" within the meaning of 49 C.F.R § 376.2 (b).

59.     The arrangement T&T Farms had with Porter and the Drivers did not and does not conform to the requirements set forth in the Truth-in-Leasing Regulations making the entirety of the transportation services T&T Farms provides using Drivers unlawful. 49 C.F.R. § 376.11(a).

60.     T&T Farms has failed to comply with, and disclose information required by, the Truth-in-Leasing Regulations including, but not limited to:

    a.  49 C.F.R. § 376.11(a) (lease must be in writing);

    b.  49 C.F.R. § 376.11(a) (receipt for equipment must be given);

    c.  49 C.F.R. § 376.12(a) (lease must be signed by parties);

    d.  49 C.F.R. § 376.12(b) (lease start and end date specified in writing);

    e.  49 C.F.R. § 376.12(c) (lease must provide carrier unqualified exclusive possession, control, and use in writing);

    f.  49 C.F.R. § 376.12(d) (compensation must be specified in writing);

    g.  49 C.F.R. § 376.12(e) (costs/charges and other items must be specified in writing);

    h.  49 C.F.R. § 376.12(f) (payment period details must be specified in writing);

    i.  49 C.F.R. § 376.12(g) (written lease must provide that copies of freight bill or other form of freight rate documentation will be given to Drivers at or before time of settlement and/or permit inspection of such documents, and Drivers must be so advised in writing);

    j.  49 C.F.R. § 376.12(h) (all charge-back/deduction items must be specified in writing in the lease together with recitation of method of calculation and advising/affording Drivers copies of validating documents);

    k.   49 C.F.R. § 376.12(i) (lease must specify/advise in writing that no products, equipment or services are required to be purchased or rented from authorized carrier and must specify the manner in which carrier may deduct from compensation for any permitted rentals or purchase);

    l.   49 C.F.R. § 376.12 (j) (lease must specify/advise in writing all obligations respecting various insurances);

    m.   49 C.F.R. § 376.12 (k) (lease must specify/advise in writing various obligations respecting escrows); and

    n.   49 C.F.R. § 376.12 (l) (all parties must sign lease and copy must be provided to Drivers to carry on board);

61.    T&T Farms held Drivers responsible for various claims, fees, costs and penalties. These policies impermissibly limit T&T Farms' exclusive possession, control and responsibility concerning the operation of the vehicles, in violation of 49 C.F.R. § 376.12(c)(1) and, in several instances, impermissibly seek to limit T&T Farms' legal obligations concerning public liability insurance under 49 C.F.R. § 376.12(j)(1) and 49 U.S.C. § 13906.

62.    T&T Farms established an escrow account on behalf of Drivers but did not specifically state the items that this escrow account may be applied to, in violation of 49 C.F.R. § 376.12(k)(2) and failed to pay required interest on such funds.

63.    T&T Farms withheld Drivers' escrow funds for longer than 45 days from the date of termination, in violation of 49 C.F.R. § 376.12(k)(6).

64.    T&T Farms required Drivers to pay for various fixed charges on a weekly basis, including but not limited to a Satellite system, in violation of T&T Farms' obligation not to

require Drivers to purchase any products, equipment or services from T&T Farms as a condition of entering into the lease, in violation of 49 C.F.R. § 376.12(i).

65.     The conduct and business practice of authorized motor carriers such as T&T Farms must comply with the Truth-in-Leasing regulations irrespective of whether their written lease agreements satisfy the requirements of the regulations.  See 49 C.F.R. § 376.12.

66.     The above violations are mere examples of the written lease violating substantial provisions of the Truth-in-Leasing Regulations. Moreover, many of the violations stated herein violate multiple sections of the Truth-in-Leasing Regulations even where only one specific section is cited.

67.     At all times material herein, T&T Farms – as directed and controlled by Halleck – was required to have a written lease with the owner or, in this case, the lessees (i.e. Porter and the Drivers) with exclusive possession of the leased trucks driven in its fleet that complied with 49 CFR § 376.

68.     At all times material herein, T&T Farms, as directed and controlled by Halleck, failed to enter a written lease with Porter and the Drivers.

69.     T&T Farms, as directed and controlled by Halleck, made unauthorized and unexpected weekly deductions from Porter's and the Drivers' pay for truck payments, escrow payments, repairs, maintenances, licenses, insurance, and other expenses.

70.     In deducting amounts from the pay of Porter and the Drivers without having a written lease, T&T Farms T&T Farms' as directed and controlled by Halleck violated the Truth-in-Leasing Regulations, 49 U.S.C. § 14704, and 49 C.F.R. § 376.

71.     Porter and the Drivers were disadvantaged by the lack of a written contract with T&T Farms and such conduct caused them significant damages in that had the proposed written

lease been presented they would not have agreed to drive for T&T Farms at all and would not have thus been defrauded out of their labor, deprived of fair compensation for such labor and otherwise subjected to unknown excessive deductions, and forgone other economic opportunities.  In other words, Porter and the Drivers detrimentally relied on T&T Farms' nondisclosures when deciding to purchase the Driving Opportunity and drive for T&T Farms and such reliance caused them economic damages.

72.     Porter and the Drivers were further disadvantaged by a lack of transparency in their contractual relationship with T&T Farms and such caused damages including under-compensation, improper and excessive deductions, and otherwise significant economic harm. T&T Farms failed and refused to provide Porter and the Drivers with documentation that would have confirmed the underpayments, overcharges, otherwise unlawful deductions and failed to advise them in writing of their express regulatory entitlement to such documents.  In sum, Porter and the Drivers were damaged by T&T Farms violations of the Truth-in Leasing Regulations and therefore have a viable claim for relief under §14704(a).

73.     T&T Farms also failed to pay each of the Drivers ninety percent (90%) of the amounts paid by shipping companies, as required by the agreement between T&T Farms and the Drivers.

74.     Halleck is the sole decisionmaker for T&T Farms and personally directed, aided, abetted, encouraged, and required T&T Farms to violate the Truth-in Leasing regulations as noted above and Halleck thus acted in derogation of 49 C.F.R. § 390.13 and is therefore personally liable to the Drivers for their damages.

## SECOND CLAIM FOR RELIEF

**Violation of the Indiana Business Opportunity Transactions Law**
**Ind. Code 24-5-8-1 et seq.**
**(Porter and the Drivers v. T&T Farms and Halleck)**

75.     Porter re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

76.     The Driving Opportunity meets the definitions of "business opportunity" under the Indiana Business Opportunity Transactions Act, Ind. Code § 24-5-8-1 and did not qualify for any exemptions thereunder. Specifically, the Driving Opportunity involved T&T Farms' and Halleck's sale or lease of product, equipment, supplies, and services for initial payment of more than $500 paid to them by the Drivers to enable them to begin or operate a business. Ind. Code § 24-5-8-1 (1)-(2).

77.     T&T Farms and Halleck represented to the Drivers the following *disjunctive* elements of the statutory claim:

> a.   that Drivers might or would earn an amount in excess of the initial payment as a result of the investment (Ind. Code § 24-5-8-1 (3)(A));
>
> b.   that a market existed for the services to be rendered by the Drivers (Ind. Code § 24-5-8-1 (3)(B));
>
> c.   that T&T Farms and Halleck might or would buy from the Drivers the services to be rendered by the Driver (Ind. Code § 24-5-8-1 (3)(C)); and
>
> d.   that T&T Farms and Halleck might or would sell or distribute the services rendered by the Driver (Ind. Code § 24-5-8-1 (3)(D)).

78.     Defendants T&T Farms and Halleck are both "sellers" of "business opportunities" as defined in the Indiana Business Opportunity Transactions Act, Ind. Code § 24-5-8-1. Neither have complied with:

    a.   the disclosure requirements for offering such plans under Ind. Code § 24-5-8-2;

    b.   the bond requirements for offering such plans under Ind. Code § 24-5-8-3;

    c.   the registration requirements for offering such plans under Ind. Code § 24-5-8-4;

    d.   the disclosure requirements for offering such plans under Ind. Code § 24-5-8-5; and

    e.   the disclosure, writing, and contract requirements for offering such plans under Ind. Code § 24-5-8-6.

79.     The consent of the Drivers to purchase the Driving Opportunity, if any, was obtained through Defendants' failure to comply with the Indiana Business Opportunity Transactions Act, Ind. Code 24-5-8-1 et seq.

80.     In selling the Driving Opportunity defendants T&T Farms and Halleck made the untrue, misleading or deceptive statements and omissions noted above.

81.     The Drivers are also entitled to damages from Defendants, including but not limited to, all monies paid as provided for Indiana Business Opportunity Transactions Act, Ind. Code 24-5-8-17.

82.     The Drivers are further entitled to reasonable attorneys' fees and court costs from Defendants under Indiana Business Opportunity Transactions Act, Ind. Code 24-5-8-17. Finally,

the Drivers are entitled to injunctive relief under Indiana Business Opportunity Transactions

Act, Ind. Code 24-5-8-18.

## THIRD CLAIM FOR RELIEF

**Violation of the Indiana Wage Payment Statute**
**Ind. Code 24-5-8-1 et seq.**
**(Porter and the Drivers v. T&T Farms)**

83.     Porter re-alleges and incorporates the foregoing paragraphs as though fully set

forth herein.

84.     T&T Farms misclassified Porter and the Drivers as independent contractors

when in fact they were employees of T&T Farms entitled to the protections of Indiana Wage

and Hour laws.

85.     Drivers work regular schedules for T&T Farms, often 6-7 days per week, and 11-

14 hours per day, in order to meet T&T Farms' service and stand-by demands. As a result, it is

impracticable for Drivers to simultaneously take on any other employment outside of T&T

Farms.

86.     While T&T Farms purports that Drivers are "independent contractors," it treats

them as employees in every material respect.  Indeed, the relationship here between T&T Farms

and the Drivers satisfies most of the indicia of employment under Indiana law, including but not

limited to, for example:

> a.  <u>No Freedom from Control or Direction</u>: T&T Farms controls the
> performance of Drivers' work under the terms and conditions of service
> with T&T Farms.  Indeed, T&T Farms determines the appearance of the
> truck (including by requiring that all trucks bear the T&T Farms' logo);
> requires Drivers to operate under T&T Farms' Department of
> Transportation operating authority; prohibits its Drivers from working for

other companies while also working for T&T Farms; requires that Drivers be "qualified" to work for T&T Farms; requires Drivers to submit to a background check; controls the limited pool of route assignments available for Drivers; determines the freight being transported and the customers to whom it is being delivered; fixes Drivers' rate of pay; retains the exclusive right to negotiate prices with the customers; and monitors Drivers' work through their dispatchers and managers, the GPS systems installed in the trucks, and through Drivers' required reporting using the truck's electronic communication system, among other forms of control.

b. <u>Work Performed Within T&T Farms Facilities and in the Usual Course of their Business</u>:  Drivers perform work that is firmly within the usual course of T&T Farms' trucking business, and inside T&T Farms' business locations. T&T Farms is in the business of delivering cargo loads to and from its customers, and the drivers are T&T Farms' essential labor force for carrying out this core function. Moreover, the Drivers rely on T&T Farms' network of facilities to retrieve and drop off freight, including T&T Farms' designated distribution centers and warehouses.

c. <u>No Independently Established Trade, Occupation, Profession or Business</u>: T&T Farms prohibits Drivers from maintaining or advertising an identity separate from T&T Farms for services of the same type they were contracted to perform for T&T Farms. Nor are the Drivers in independently established trades, occupations, professions or businesses. The Drivers work in a job that is synonymous with T&T Farms' core function of

transporting freight and offer no independent trade. Nor are they operating

"independent businesses" that advertise services or solicit clients.

d. <u>T&T Farms Supplies the Instrumentalities and Equipment</u>:  Drivers do not

own their trucks, trailers, or other equipment, but rather rely on T&T Farms

leasing program to acquire the same. T&T Farms also requires Drivers to

use and pay for T&T Farms' approved insurance and meeting coverage

thresholds prescribed by T&T Farms.

e. <u>T&T Farms Anticipated Employing Drivers For Years</u>:  The truck and

trailer lease terms for Drivers was 4 years.

87.    T&T Farms also established work boundaries including imposing fines for

violating its policies for failure to meet reporting requirements, failure to abide by set speed

limits, unsecured loads, window tinting and the like.  T&T Farms imposed a "3 strike rule" and

notes that "Upon the 3rd Strike your employment will be Terminated!!!"  See Exhibit A hereto.

Drivers that apply window tinting to the trucks are immediately terminated.  *Id.*

88.    Because Porter and the Drivers are employees, they are entitled to the protections

of Indiana wage and hour laws.  At issue here are the pay deductions that T&T takes from

Porter and the Drivers for truck payments, trailer payments, computers, fuel, taxes, insurance

and other items.  Attached as Exhibit B hereto is an exemplar settlement statement for Mr.

Porter showing such deductions, which are unlawful for two reasons.  First, Indiana's wage

assignment statute provides that "[a]ny direction given by an employee to an employer to make

a deduction from the wages to be earned by said employee, after direction is given, shall

constitute an assignment of the wages of said employee." Ind. Code § 22-2-6-1. But such an

assignment is valid only if it is (1) in writing; (2) signed by the employee personally; (3) by its

terms revocable at any time by the employee upon written notice to the employer; (4) agreed to in writing by the employer; and (5) delivered to the employer within ten days after execution. *Id.* Ind. Code § 22-2-6-2(a).  Here, there are no valid writings between T&T Farms, on the one hand, and the Porter and the Drivers, on the other hand, authorizing the deductions that satisfy Ind. Code § 22-2-6-2(a).

89.     Second, even if all the form and content requirements were met, wage assignments are valid only if they are made for one of the purposes expressly authorized by the statute. Ind. Code § 22-2-6-2(b).  Here, the deductions made are not and were not authorized under law.

90.     T&T Farms also fines Drivers and deducts such fines from the amount of their compensation for various reasons including fines for violating its policies for failure to meet reporting requirements, failure to abide by set speed limits, unsecured loads, window tinting and the like. See Exhibit A hereto.  T&T Farms imposed a "3 strike rule" and notes that "Upon the 3rd Strike your employment will be Terminated!!!"  *Id.*  Under Indiana law it "is unlawful for any employer to assess a fine on any pretext against any employee and retain the same or any part thereof from his wages." Ind. Code § 22-2-8-1.

91.     When an employer fails to make payment of wages in accordance with Indiana's Wage Payment Statute, the employer is also required to "pay to such employee for each day that the amount due to him remains unpaid ten percent (10%) of the amount due to him in addition thereto, not exceeding double the amount of wages due. . . ." Ind. Code § 22-2-5-2. Consequently, because the deductions for expenses and fines T&T Farms tool from Porter and the Drivers do not comport with Indiana law, T&T Farms owes Porter and the Drivers an additional two times the amounts due as liquidated damages.  Porter and the Drivers are further

entitled to be awarded reasonable attorney's fees and costs related to this claim pursuant to Ind. Code § 22-2-5-2.

## FOURTH CLAIM FOR RELIEF

### Failure to Pay Minimum Wage
### Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*
### (Porter and Collective vs T&T Farms and Halleck)

92.     Porter re-alleges and incorporates the above paragraphs as though fully set forth herein.

93.     T&T Farms violated the FLSA by knowingly failing to maintain records of all hours worked.

94.     T&T Farms violated the FLSA by knowingly failing to compensate Porter and the Drivers the federally mandated minimum wage in violation of 29 U.S.C. § 206 for all hours worked.

95.     In addition, or in the alternative, T&T Farms violated 29 U.S.C. § 206 by deducting costs for expenses, tools and equipment from Porter's and the Drivers' wages so as to cause their wages to at times fall below the federally mandated minimum wage rate.

96.     At all material times, Halleck was a corporate officer of T&T Farms with total operational control over T&T Farms including controlling its payroll, checks, records, employment practices, and hiring decisions.  Halleck further controlled and implemented decisions that caused T&T Farms to misclassify Porter and the Drivers as independent contractors and refuse to pay them minimum wages.  Consequently, Halleck is also an "employer" under 29 U.S.C. § 203(d) along with T&T Farms and therefore jointly and severally liable under the FLSA for unpaid wages.

97.     T&T Farms' and Halleck's actions were willful.  Accordingly, T&T Farms and Halleck are liable under 29 U.S.C. § 216(b) for liquidated damages in an amount equal to the wages T&T Farms and Halleck failed to pay Porter and the Drivers as a result of the foregoing violation of 29 U.S.C. § 206.

98.     Halleck Porter and the Drivers are entitled to all of the unpaid wages, plus an additional equal amount as liquidated damages, court costs, attorneys' fees and expenses they expend in successfully bringing this action to recover their unpaid wages and any other relief deemed appropriate by the Court.

## FIFTH CLAIM FOR RELIEF

### Constructive Fraud
### (Porter and the Drivers v. T&T Farms and Halleck)

99.     Porter re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

100.     Under Indiana law, the tort of constructive fraud requires "the existence of a duty by virtue of a special relationship between the parties; deceptive and material representations or omissions made in violation of that duty; and reliance on the deceptive statements or omissions resulting in injury to the complaining party and an unconscionable advantage to the defrauding party." *Mudd v. Ford Motor Co.*, 178 F. App'x 545, 547 (7th Cir. 2006) (citing *Doe v. Howe Military Sch.*, 227 F.3d 981, 991 (7th Cir. 2000)).   As pertinent here, constructive fraud may arise where the relationship between the parties is that of buyer and seller, because in a buyer-seller relationship one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other. The relationship is therefore one which invokes a duty of good faith and fair dealing. *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1251 (Ind. Ct. App. 1998).  Here, a buyer-seller relationship existed between the Drivers (the buyers)

and T&T Farms and Halleck (the sellers) regarding the Driving Opportunity and all its elements.  In addition, an employer-employee relationship as alleged here between T&T Farms and the Drivers also satisfies the special relationship requirement of Indiana law for constructive fraud.

101.    Once T&T Farms and Halleck embarked on offering, advertising, pitching and selling the Driving Opportunity to Porter and all other Drivers, it owed them a duty of full and truthful disclosure.

102.    T&T Farms and Halleck offered Porter and the Drivers the Driving Opportunity by making express positive false assertions and representations to each Driver that it would provide a career opportunity and further made false representations about the levels income that Drivers had achieved and could expect.  Specifically, in about February of 2020, Halleck had a phone call with Porter in which Halleck stated that T&T Farms' offered a "lease-purchase" program where drivers would lease a truck from T&T Farms and own it after the end of the lease and that drivers averaged a net income between $1,200 and $1,500 per week under the lease purchase program.  These representations were material as there is nothing more material regarding a business opportunity than representations regarding the earning of money.  When T&T Farms and Halleck made these false representations, they knew they were false and/or made them recklessly without knowledge of the truth.  T&T Farms and Halleck were in unique position of knowledge about the Driving Opportunity vis a vis Porter and the Drivers and thereby enjoyed a position of superiority over them.  When T&T Farms and Halleck made the false representations, they intended that Drivers would rely on them in making the decision to purchase the Driving Opportunity and the Drivers did so.

103.     Further, in Indiana, constructive fraud may also be premised solely on the concealment of material facts.  Here, T&T Farms and Halleck concealed material facts from each Driver that:

   a.  Driver turnover was very high at T&T Farms;

   b.  The Driving Opportunity did not present or provide a reasonable sustained economic opportunity for Drivers;

   c.  Drivers that had purchased the Driving Opportunity often failed within months and lost money;

   d.  Drivers that had purchased the Driving Opportunity on average earned nowhere close to the represented income;

   e.  Drivers that had purchased the Driving Opportunity often had weeks where they earned very little or even went negative in their pay;

   f.  Drivers that had purchased the Driving Opportunity never drove close to the number of average miles on a sustained basis that were necessary to break even;

   g.  Few if any Drivers that had purchased the Driving Opportunity actually ended up owning their truck;

   h.  T&T Farms and Halleck did not and would not comply with the Truth-in-Leasing Regulations;

   i.  T&T Farms and Halleck did not and would not offer written contracts disclosing and/or governing the relationship with the Drivers, including terms involving compensation, expenses, duration, and the services T&T Farms and Halleck would provide to the Drivers;

j.  T&T Farms charged Drivers that had purchased the Driving Opportunity for undisclosed items such as various types of insurance, tolls, fuel tax, EFS fees, escrow fees, and dispatcher payments and would continue to do so in the future;

k.  T&T Farms and Halleck had charged Drivers that had purchased the Driving Opportunity excessive amounts for items such as various types of insurance, tolls, fuel tax, EFS fees, escrow fees, and dispatcher payments and would continue to do so in the future;

l.  T&T Farms and Halleck had not and would not pay Drivers fuel surcharges to which they were/would be entitled;

m.  T&T Farms and Halleck had not and would not pay Drivers interest on escrow accounts to which they were/would be entitled;

n.  T&T Farms and Halleck had failed and refused to provide documents and data validating the gross compensation owed to Porter and the Drivers and would continue to do so in the future;

a.  T&T Farms and Halleck failed and refused to provide documents and data validating the expenses and deductions take from Porter and the Drivers and would continue to do so in the future; and

b.  T&T Farms and Halleck imposed working terms and conditions on Porter and the Drivers that rendered them employees rather than true independent contractors and would continue to do so in the future;

104.     When T&T Farms and Halleck omitted the above noted material facts, they intended that Drivers would rely on them in making the decision to purchase the Driving Opportunity, and the Drivers did so.

105.     T&T Farms and Halleck made material representations and omissions as noted above in derogation of their duty to tell the full truth.

106.     The undisclosed and true material facts were known only to T&T Farms and Halleck and not within the reasonable attention and observation of Porter and other Drivers that purchased the Driving Opportunity.

107.     These misstatements and omissions were material and Porter and the putative class relied on such misstatements and omissions in purchasing the Driving Opportunity.  Had T&T Farms and Halleck provided the full truth, Porter and the Drivers would not have purchased the Driving Opportunity.

108.     Porter and the Drivers suffered damages as a direct result of T&T Farms' and Halleck's material misstatements and omissions in that they paid moneys for the Driving Opportunity, were defrauded out of their labor and full and proper compensation for same, and T&T Farms and Halleck gained an unconscionable advantage over them.

109.     In the conduct described above, T&T Farms and Halleck acted intentionally with malice and/or with reckless disregard toward the rights of Porter and the Drivers, entitling Porter and the putative Class to an award of actual, consequential, and punitive damages under applicable law.

## SIXTH CLAIM FOR RELIEF

**Breach of Contract and Covenant of Good Faith**
**(Porter and the Drivers v. T&T Farms and Halleck)**

110.    Porter re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

111.    T&T Farms breached its contractual and good faith obligations to Porter and the Drivers by:

a.   Failing to pay Porter and the Drivers 90% of the actual gross revenue that it received;

b.   Failing and refusing to provide documents and data supporting the amounts of gross revenue owed to the Drivers;

c.   Taking unauthorized and excessive charges/deductions from Drivers' compensation;

d.   Failing and refusing to provide documents and data supporting the amounts of charges/deductions taken from Drivers;

e.   Failing to pay interest on escrows and overcharging escrow accounts and inflating repair and maintenance charges;

f.   Failing and refusing to pay the Drivers fuel surcharges collected from customers;

g.   Charging Drivers for "dispatcher fees" paid to T&T Farms' employees;

h.   Failing and refusing to commit compensation, charges/deductions, and other essential terms to writing;

i.   Charging excessive and/or unauthorized fees for repairs; and

j.  Acting dishonestly and failing to abide by state and federal law in carrying out their obligations to Porter and the Drivers.

112.    T&T Farms acted in order to injure the rights of Porter and the Drivers so as to deprive them of the benefits of the agreements.

113.    T&T Farms had a legal duty to act honestly, in good faith and in accordance with federal and state law during all contractual negotiations with Porter and the Drivers and in the performance of their obligations under the contracts.

114.    At all times relevant herein, T&T Farms were presumed to know the laws governing the contracts and their employment relationships with Porter and the Drivers including its obligations under the Truth-in Leasing Regulations and the Indiana laws at issue here.

115.    T&T Farms breached its legal duties to Porter and the Drivers and did not otherwise deal in good faith, fairly, or in accordance with federal or state law for the reasons stated above.

116.    As a result of T&T Farms' conduct, Porter and the Drivers have suffered damages. T&T Farms is required to compensate, reimburse, and make Porter and the Drivers whole for any and all compensation and benefits they would have received had it not been for its illegal actions, including but not limited to past lost earnings.

## PRAYER FOR RELIEF

WHEREFORE, Porter on behalf of himself, the Collective, and the Drivers prays for relief as follows:

a.  For damages and restitution according to proof at trial for all injuries;

b.  For a declaratory judgment that T&T Farms has violated federal Indiana law and public policy as alleged herein;

c.  For preliminary, permanent, and mandatory injunctive relief prohibiting T&T Farms, its officers, agents, and all those acting in concert with them from committing in the future those violations of law herein alleged;

d.  For an order awarding Porter and the Drivers compensatory damages, including restitution, recovery of all money and other valuable consideration paid for the Driving opportunity, actual damages, and all other sums of money owed to Porter and the Drivers, together with interest on these amounts, according to proof;

e.  For an order awarding Porter and the Drivers civil penalties pursuant to Indiana law, with interest thereon;

f.  For an award of reasonable attorneys' fees as provided by Indiana and federal law;

g.  For all costs of suit;

h.  For interest on any damages and/or penalties awarded, as provided by applicable law; and

i.  For such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Porter hereby demands a jury trial on all claims and issues for which Porter is entitled to a jury.

Dated: <u>July 23, 2021</u>       Respectfully submitted,


            <u>/s/ *Scott D. Gilchrist*</u>
            Richard E. Shevitz (#12007-49)
            Scott D. Gilchrist (#16720-53)
            COHEN & MALAD, LLP
            One Indiana Square, Suite 1400
            Indianapolis, IN 46204
            Tel: 317-636-6481
            Fax: (317) 636-2495
            rshevitz@cohenandmalad.com
            sgilchrist@cohenandmalad.com

            Robert S. Boulter
            (*pro hac vice* to be submitted)
            LAW OFFICES OF
             ROBERT S. BOULTER
            1101 5th Ave #310
            San Rafael, CA 94901
            Tel: (415) 233-7100
            rsb@boulter-law.com

            ***Attorneys for Porter and***
            ***the Putative Classes***