UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MICHAEL PORTER,

        Plaintiff,

    v.                                                     CAUSE NO. 3:21-CV-529 DRL-SJF

T&T FARMS, INC. and THOMAS
HALLECK, JR.,

        Defendants.

<u>OPINION AND ORDER</u>

Michael Porter claims T&T Farms, Inc. and its owner, Thomas Halleck, Jr., misled him and similarly situated truck drivers with a Driving Opportunity Program. After the court's motion to dismiss ruling, he maintains claims against T&T and Mr. Halleck under federal truth-in-leasing regulations (count 1), against both defendants under the Indiana Business Opportunity Act (count 2), against T&T under Indiana's Wage Payment Statute (count 3), against both defendants under the Fair Labor Standards Act (count 4), against both defendants for constructive fraud (count 5), and against T&T for breach of contract (count 6). T&T and Mr. Halleck moved for summary judgment on all counts. The court grants summary judgment only in part.

BACKGROUND

This case centers around a Driving Opportunity Program between T&T and its drivers. T&T is a motor carrier company that facilitates the transport of commercial cargo [63-9 No. 3]. It operates a "lease-purchase program" whereby drivers use the equipment to provide cargo transportation services while making regular payments toward buying trucks and "leasing back" the equipment to T&T [63-11]. Thomas Halleck, Jr. heads the company and owns it with his wife

[63-10 Tr. 9]. T&T enters into independent contractor agreements with drivers, who then transport commercial cargo loads [75 ¶ 6; 63-10 Tr. 97].

Michael Porter heard about T&T from a friend, applied to work there, started working with the company in February 2020, and received his first settlement statement that month [75-1 Tr. 26, 54]. He apparently signed one contract (a "contractor agreement") before he received his truck and trailer from T&T, but this contract has not been submitted in the record and he says he cannot recall receiving a copy [75-1 Tr. 42-44]. Mr. Porter also signed an Independent Contractor Agreement (ICA) with T&T on November 20, 2020 [63-11 at 7-8; 63-13 Tr. 92].

In the ICA, Mr. Porter and T&T agreed that Mr. Porter would receive title to a 2015 International Harvester tractor and a 2012 Fontaine trailer from T&T on the company's credit that he would pay over time and that he would lease their use back to the company [63-11; 75 ¶ 10]. The agreement between the parties provided that Mr. Porter would be paid by the load—85 percent of gross revenue for customers of T&T and 90 percent of gross revenue for loads arranged by a broker [63-11 § C, App. A]. T&T would charge certain costs back to Mr. Porter out of the gross pay, including but not limited to "expenses set forth in this agreement as well as C.O.D. and freight collect remittances due carrier, cargo claims, property damage, leasing materials, log books, towing charges, insurance deductibles, [and] reasonable attorney fees incurred in reducing potential liabilities" [*id.* § L]. T&T agreed to provide Mr. Porter with "written itemization and documentation of all charge backs prior to making such charge backs" [*id.*].

Among other things, the parties also agreed that T&T had exclusive possession and control of the equipment for the ICA's duration; Mr. Porter would be responsible for licenses, permits, fuel costs, tolls, ferries, and charges not collected by T&T because of failed

documentation; Mr. Porter would be responsible for loading and unloading all shipments; and T&T would pay Mr. Porter within 15 days after he submitted his payment documentation [*id.* §§ E, F]. The ICA also provided for T&T to establish an escrow account for Mr. Porter with certain conditions [*id.* § N]. It noted that it was a complete agreement between the two parties [*id.* § S]. T&T subsequently provided Mr. Porter with settlement statements showing the revenue and deductions for each load [63-13 Tr. 49-50; 75 ¶ 21; 75-4].

While driving for T&T, Mr. Porter could accept or decline loads [63-13 Tr. 111], and T&T never demanded that he accept a load he didn't want to accept [63-12 ¶ 7]. Mr. Porter chose his own routes [63-13 Tr. 121]. No drivers for T&T, including Mr. Porter, received W2s [63-10 Tr. 73]. T&T paid drivers such as Mr. Porter by the load [63-11 § C, App. A; 75 ¶ 31].

Mr. Porter claims that T&T misrepresented or failed to disclose material facts about the Driving Opportunity Program, ultimately defrauding Mr. Porter (and other drivers) and resulting in lower to no compensation. The company requests summary judgment on all claims.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true,"

*Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

A. *Truth-in-Leasing Regulations (Count 1 against Both Defendants).*

The Interstate Commerce Commission Termination Act of 1995 transferred the authority to regulate interstate motor carriers from the Interstate Commerce Commission to the United States Department of Transportation. 49 U.S.C. § 13501. The Federal Highway Administration (within this department) administers truth-in-leasing regulations.

These regulations are "designed to promote full disclosure between the carrier and owner-operator in the leasing contract, to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry, and to eliminate or reduce opportunities for skimming or other illegal practices." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 678 (7th Cir. 2022) (quotations omitted). They are intended to protect owner-operators from abusive leasing practices by carriers—many arising from the nationwide strikes by independent truckers that occurred during the "winter of discontent" in 1973. *Operator Indep. Drivers Ass'n v. Comerica Bank*, 636 F.3d 781, 795 (6th Cir. 2011). The "method selected to achieve this goal was to require that

certain terms be included in every lease between carriers and owner-operators." *Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co.*, 367 F.3d 1108, 1115 (9th Cir. 2004).

Mr. Porter claims that T&T violated truth-in-leasing regulations by not making certain mandatory disclosures under 49 C.F.R. § 376.1.[1] He cannot seek an injunction, now that he has left this position and the contract has concluded, for there is no real or immediate threat of future injury, and the law disfavors "obey-the-law" injunctions. *Simic v. City of Chi.*, 851 F.3d 734, 738 (7th Cir. 2017); *EEOC v. AutoZone, Inc.,* 707 F.3d 824, 843 (7th Cir. 2013). He can seek only damages. In a private action for damages under 49 U.S.C. §14704(a)(2), carriers are "liable for damages sustained by a person as a result of an act or omission of that carrier." *Brant*, 43 F.4th at 678; *see also Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*, 192 F.3d 778, 785 (8th Cir. 1999). In short, to establish a claim, Mr. Porter must show that T&T violated one or more of the regulations and that a violation caused him damages.

T&T argues that the ICA satisfies all regulations and that, even if it doesn't, Mr. Porter cannot show any damages stemming from violations of these regulations. Mr. Porter counters that any disclosures from the ICA shouldn't be considered because it was signed in November 2020 (nine months after he began driving) and because the provisions don't meet the requirements of 49 C.F.R. § 376.1. He originally alleged that T&T violated fourteen regulatory subparts. Without case law, both sides primarily focus on whether the ICA comports with these regulations and whether any damages resulted from the ICA's argued deviations. T&T says Mr. Porter cannot point to any harm. T&T argues this means that Mr. Porter lacks standing for any

---

[1] Though recognizing that this count is against both T&T and Mr. Halleck, the court refers to them collectively as T&T in this section for ease of reference.

time period, whether for the initial nine months or otherwise, because he cannot point to any concrete injury from alleged violations of the regulations. T&T calls any violation a "bare procedural" one.

The court first addresses a timing problem. The earliest settlement statement in the record is dated February 29, 2020 [75-4 at 2]. It lists Mr. Porter's first load, from New Carlisle, Indiana to Greensboro, North Carolina on February 20, 2020 [*id*.]. Nothing in the record shows a signed lease agreement at that time. As Mr. Porter points out, the ICA that T&T argues satisfies all regulatory requirements was not signed until November 20, 2020—nine months after Mr. Porter began driving [63-11 at 7-8].

As counterpunch, T&T calls this inconsequential because the regulations lack a timing requirement. On this understanding, a company could backdate an agreement to cover the relevant time period. Whether this might be a lawful option, the ICA forecloses such an argument here. The agreement identifies November 20, 2020 as its "effective date"—not any prior date. It echoes that it "shall begin on the date indicated on the signature page and shall remain in effect for a period of one (1) year from the date." By its plain language, the ICA cannot be interpreted to be retroactive and to cover the prior nine months. With the signed agreement being T&T's defense, and with no signed agreement in the record for these beginning nine months, a reasonable jury could conclude that, for the nine-month period from February 20 to November 19, 2020, T&T violated truth-in-leasing regulations—but only so long as there was some resulting harm. *See* 49 U.S.C. § 14704(a)(2); *Brant*, 43 F.4th at 678.

The court thus turns to the post-ICA period and the various regulations at issue. T&T's summary judgment motion fails to certify that the parties met and conferred, and at times it seems

6

to show. Parties must meet and confer in good faith before filing any summary judgment motion to streamline the issues and to plan the efficient presentation of arguments. The movant must certify in the motion that the parties have so conferred, else the court may take remedial action. Because the parties have fully-briefed the motion, the court will not take remedial action this time, but the parties should note that failure to comply with the court's requirements in the future may result in sanctions or stricken motions.

A meeting between the two sides here would have helped establish—and thus saved time for both the parties and the court—which violations Mr. Porter was still actually pursuing. The complaint alleges fourteen violations, and T&T briefs them all. In his response, Mr. Porter only specifically contests four regulatory bases for his claims—49 C.F.R. §§ 376.12(h), 376.12(i), 376.12(j), and § 376.12(k).

The only argument Mr. Porter raises on four other violations—49 C.F.R. §§ 376.11(a), 376.12(a), 376.12(d) and 376.12(e)—is that T&T improperly relies on the settlement statements. He asserts the ICA didn't incorporate the settlement statements, so the court should reject any argument relying on them. Even crediting this argument, this still leaves six regulations Mr. Porter seems to abandon as theories. *See Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 713 (7th Cir. 2021) ("party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered"); *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (abandonment when not argued in summary judgment response). Far better for the parties to have talked.[2] The court walks just the battlelines today, but it does

---

[2] The reasons would have been self-evident. For instance, § 376.12(b) requires the lease to "specify the time and date or the circumstances on which the lease begins and ends," and the ICA clearly outlines a one-year duration [63-11 § B]. Section 376.12(c) requires that the lease "provide that the carrier lessee shall have exclusive possession,

so only to help illustrate that in the end Mr. Porter has failed to establish actual damages and thus his standing for his regulatory claim.

1. *49 C.F.R. § 376.12(h).*

The parties contest § 376.12(h) concerning chargeback items. This regulation requires that the "lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge." 49 C.F.R. § 376.12(h). T&T directs the court to § E(2) and § L of the ICA.

Mr. Porter identifies certain charges that the ICA seems to omit by name—for instance, ESF transaction fees, hotel expenses, dispatcher commissions, and cash advance fees [75-4 at 43-45]. The ICA may otherwise capture these expenditures by the carrier [63-11 § C], but not specify them item-by-item. T&T points to the settlement statements; though settlement statements at times may help satisfy the disclosure of chargebacks so long as the agreement discloses the method of computing the chargeback (the costs to owner-operators), *see, e.g., Owner-Operator Indep. Drivers Ass'n v. Landstar Sys.*, 622 F.3d 1307, 1320-23 (11th Cir. 2010), the ICA seems not to do so here for certain charges that appear only on the settlement statements [75-4].

For this reason, T&T argues in the alternative that these deductions are just "minimal." This isn't a defense. The regulation draws no distinction between major and minimal deductions;

---

control, and use of the equipment for the duration of the lease," so does the ICA [*id.* §§ A, F(1)]. Section 376.12(f) governs the timing of payment, and ICA matches the regulation [*id.* § J]. Section 376.12(g), which addresses billing, likewise is covered by the ICA [*id.*]. No reasonable jury could find violations of the regulations for any of these or other abandoned claims.

instead, it says "all items" that may be deducted from the lessor's compensation must be disclosed. 49 C.F.R. § 376.12(h). The ICA thus fails to "clearly specify all items" that the carrier pays that thereafter will be deducted from the driver's compensation.

In addition, the ICA omits a recitation of how each deduction will be computed. Although at times the ICA alludes to more specifics in § E and § F(4) and in its appendices as to compensation, fuel adjustments, cargo claims, insurance, and the like, it offers less by way of computation of many chargebacks in § C and § L—more particularly, those specified by Mr. Porter as disclosed only in the settlement statements.[3] The ICA says gross revenue (as defined) will be reduced by "any direct or indirect cost, expense or fee causing a reduction in revenue to the Carrier" [63-11 § C] but never says how these deductions will be computed—how the "amount of each item [will] be computed." 49 C.F.R. § 376.12(h). The ICA's allusion to reducing "potential liabilities" from the driver's actions or inactions adds no real meaning to this computation. *See Landstar*, 622 F.3d at 1317 (referring broadly to "third party" fees wasn't a clear statement of computation) (citing cases). A reasonable jury could find against T&T as to this regulatory requirement so long as Mr. Porter incurred damages as a result.

2.  *49 C.F.R. § 376.12(i).*

This section requires the lease to "specify that the lessor is not required to purchase or rent any products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement." 49 C.F.R. § 376.12(i). Both parties agree that the ICA properly

---

[3] In contrast, cargo claims could not be identified in the lease precisely until after they were made, so the regulations in such a scenario only require the carrier to "provide the lessor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to the lessor." 49 C.F.R. § 376.12(j)(3). The regulations thus require certain pre-disclosures and likewise contemplate disclosures that at times occurred in the settlement statements.

includes this language [63-11 § K]. Mr. Porter nonetheless claims that the statement turned out to be false because he was required to purchase a tablet, and he contends that the ICA also omits any mention of the truck and trailer lease payments.

The truck and trailer payments don't fall under this regulation. This regulation says the lessor (Mr. Porter) must not be made to purchase or rent any property from the authorized carrier (T&T). 49 C.F.R. § 376.12(i). As part of the agreement's structure, Mr. Porter held title to the truck and trailer [63-11 § A]. He then agreed that the equipment would be devoted to the carrier's exclusive use—that is, he leased the equipment back to T&T [*id.* § F]. This "leaseback" arrangement comports with the regulation by resting on T&T's extended credit.

Next, T&T disputes that the drivers had to purchase a tablet under the ICA, but Mr. Halleck testified that the drivers paid for a tablet out of their equipment settlement [75-2 Tr. 128]. Settlement statements reflect charges for a tablet payment [75-4 at 2 (indicating tablet payment one of ten)]. Mr. Halleck testified that the drivers had to log their information on a tablet [75-2 Tr. 127]. Nothing in the record suggests that the tablet was anything specially designed; Mr. Halleck testified that it was "just a cheap tablet," but the drivers paid for it from T&T out of their settlements [*id.* Tr. 128]. Whether Mr. Porter was required to purchase the tablet from T&T is at least a question for a jury on this record. *See Mervyn v. Nelson Westerberg, Inc.*, 76 F. Supp.3d 715, 719 (N.D. Ill. 2014) (this regulation "imposed a substantive obligation on the carrier, as the regulation's introductory language requires carriers to actually comply with the lease terms that the regulation's subsections, like § 376.12(i), mandate for inclusion in the lease"). Once more the only lingering question is damages.

### 3. *49 C.F.R. § 376.12(j).*

Section 376.12(j) deals with insurance requirements. It requires the lease to specify who is responsible for providing insurance (outside of the carrier's provision of public protection insurance under Federal Motor Carrier Safety Administration (FMCSA) regulations); and when the carrier will charge the driver for any of this other insurance, "the lease shall specify the amount which will be charged-back to the lessor." 49 C.F.R. § 376.12(j)(1); *see also Owner-Operator Indep. Drivers Ass'n v. Mayflower Transit, LLC*, 615 F.3d 790, 793-94 (7th Cir. 2010).

Mr. Porter raises two potential violations. First, he says the ICA omits the charged-back amount for insurance even though it specifies certain types of insurance. Second, he claims that drivers are charged for certain medical and paid-time-off coverage (what he calls "Occidental/Accidental" insurance) never mentioned in the ICA.

The ICA says insurance "responsibilities and obligations" appear in § F(4) and Appendix B [63-11 § E(5)]. There, the ICA specifies that the "[c]arrier shall maintain public liability, property damage, and cargo insurance in such amounts as are required by the Interstate Commerce Commission, Department of Transportation, and applicable state regulatory agencies" [*id.* ¶ F(4)]. This includes public protection insurance under FMCSA regulations. Appendix B expounds on these requirements—namely that, with regard to public liability, property damage, common carrier service, and cargo loss insurance, the driver will be charged back for the carrier's expense in obtaining and administering such coverage [*id.* App. B]. An allowed chargeback includes such "insurance deductibles" [*id.* § L]. Any such insurance for the driver's work for other carriers remained the driver's responsibility [*id.* App. B].

Mr. Porter is right that the ICA omits at times the amount to be charged back to the driver, and may not always specify type-by-type all insurance coverages, but the ICA permits T&T to chargeback insurance deductibles. T&T cites once more the settlement statements, and they seem to specify the types and amounts of insurance [*see, e.g.*, 75-4 at 42]—all contemplated by the chargeback provision of the ICA [63-11 § L]. A reasonable jury could nonetheless find that the company violated the letter of this regulation, but Mr. Porter would need to establish damages as a result of that violation.

4. *49 C.F.R. § 376.12(k).*

This regulation deals with escrow funds and lists requirements, including the "amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party" and the "specific items to which the escrow fund can be applied." 49 C.F.R. § 376.12(k). T&T once more cites the ICA. The agreement authorizes the carrier "to establish an escrow in accordance with the provisions set for in Appendix C" [63-11 § N]. Appendix C says the principal amount "shall not exceed $1,000" and that the funds "may be applied to the applicable paragraphs in the agreement" [*id.* App. C]. Though the ICA seems to specify a ceiling on the escrow principal, it omits the intended uses for such funds.

As an example, Mr. Porter reports that T&T collected maintenance funds that weren't disclosed in the ICA. But the ICA clearly outlines that the independent contractor must "provide all the equipment ready to operate and fully roadworthy," including "all necessary oil, fuel, tires, and other parts, supplies, and equipment necessary or required for the safe and efficient operation and maintenance of the equipment" or its "repairs" [*id.* § E(2)]. The parties seem to agree the settlement statements disclosed the specific amounts [75-2 Tr. 147], though the agreement may

not have done so consistent with other regulations. But § 376.12(k) concerns the escrow, and Mr. Porter never offers any facts to permit a reasonable jury to find that the company violated any escrow obligations—namely, that the company ever deducted maintenance costs from the escrow. In fact, the record seems to establish that T&T never used an escrow account from 2015 [*id.* Tr. 107]. The court thus grants summary judgment on this theory.

5.   *Settlement Statement Claims under 49 C.F.R. §§ 376.11(a), 376.12(a), 376.12(d) and 376.12(e).*

T&T defends its compliance with a group of regulations based not just on the ICA, but the settlement statements given to Mr. Porter. 49 C.F.R. § 376.11(a) requires a written lease granting the use of the equipment and meeting the requirements in 49 C.F.R. § 376.12, which likewise requires a written lease signed by the parties and the specific date on which the lease begins and ends as well as other requirements. *See supra.*

The ICA satisfies the written lease requirement (even if not all other regulations) and grants T&T's use of the equipment [63-11 § F]. T&T never explains why the company complied with 49 C.F.R. § 376.11(a) before November 2020, so the court would need to deny summary judgment for the nine months beforehand in which no written lease existed so long as Mr. Porter established actual damages. Nothing in the ICA made it retroactive to cover the period that had already passed over those nine months. Though the parties signed a written agreement in November 2020, in certain ways (already discussed) a reasonable jury could say § 376.11(a) was violated because it failed to comply with all the conditions in § 376.12, though Mr. Porter would still need to prove damages.

49 C.F.R. § 376.12(d) governs compensation and requires the method of compensation to be stated "on the lease or in the attached addendum." The lease or addendum must be

"delivered to the lessor prior to the commencement of any trip in the service of the authorized carrier." 49 C.F.R. § 376.12(d). Once more, the ICA states the method of compensation—namely the percentage of gross pay owed to Mr. Porter [63-11 § C, App. A]—and discloses certain deductions [*e.g.*, *id.* §§ E(2), L], and Mr. Porter never explains why the ICA fails to disclose the amount to be paid for his services as a driver. At the same time, T&T never explains why this ICA covers the nine months in which Mr. Porter provided services without full disclosure of compensation.

Finally, 49 C.F.R. § 376.12(e) requires an outline of which parties will be responsible for certain costs, such as fuel, fuel taxes, mileage, permits, tolls, ferries, licenses, plates, and the like. Mr. Porter never identifies what the ICA lacks of importance from this regulation [63-11 §§ E(2), L]. Even so, any violation would require proof of actual damages.

6.  *Actual Damages.*

Having concluded that a reasonable jury could find that T&T violated the letter of certain truth-in-leasing regulations during the nine-month period before the ICA and that T&T violated §§ 376.12(h), 376.12(i), and 376.12(j) after November 20, 2020, the court turns to the question of damages. The statutory scheme provides two possible remedies to truth-in-leasing regulations violations: injunctive relief or "damages sustained by a person as a result of an act or omission of that carrier or broker." 49 U.S.C. § 14704(a).

Mr. Porter cannot seek injunctive relief now, as he no longer works with T&T, nor did he ever seek injunctive relief after his pleading. *See infra.* His only possible remedy is damages. *See Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co.*, 632 F.3d 1111, 1121 (9th Cir. 2011) (when a statute explicitly includes certain remedies, courts should not read others into it); *see also Meghrig*

14

*v. Kfc W.*, 516 U.S. 479, 487-88 (1996) (when Congress has provided remedies, "it cannot be assumed that Congress intended to authorize by implication" other remedies).

Mr. Porter bears the burden of proving actual damages. *Fox v. TransAm Leasing, Inc.*, 839 F.3d 1209, 1218 (10th Cir. 2016) (citing *Landstar Sys.*, 622 F.3d at 1324); *see also Swift*, 632 F.3d at 1122 (every court to consider it agrees that "the statute requires proof of actual damages"). He must show "monetary harm" from the violations. *Fox*, 839 F.3d at 1218. "[R]estitution and disgorgement are unavailable under the Act." *Landstar Sys.*, 622 F.3d at 1324.

T&T argues that Mr. Porter hasn't established any damages. Mr. Porter argues that he has established harm by noting deductions that weren't disclosed. Showing undisclosed deductions isn't alone sufficient. *Owner-Operator Indep. Drivers Assoc. v. C.R. England*, 508 F. Supp.2d 972, 981-82 (D. Utah 2007) ("Simply proving that Defendants charged more to Plaintiffs for a product or service than it paid . . . is insufficient, without more, to establish that Plaintiffs have sustained damages."). Mr. Porter needs more than to have alleged harm; "allegations must be backed up by proof once a case gets past the pleading stage." *Thomas v. LVNV Funding, LLC*, 2025 U.S. App. LEXIS 6699, 4 (7th Cir. Mar. 21, 2025). He can establish damages with "reference to affidavits, deposition transcripts, or specific exhibits." *Fox*, 839 F.3d at 1219.

On this record, no reasonable jury could find that Mr. Porter suffered monetary harm from alleged technical violations, nor does he make any real effort to show he did. He received weekly accounting of all the deductions on the settlement statements, both before and after signing the ICA [75-4]. The ICA expressly contemplates that the carrier and contractor will settle up, anticipating that the contractor will provide certain documentation for review, and that the carrier will provide a settlement statement of all chargebacks [63-11 §§ J, L]. Whether the ICA

actually incorporated the settlement statements or not, *see Performance Servs. v. Hanover Ins. Co.*, 85 N.E.3d 655, 660 (Ind. Ct. App. 2017), and it seems the ICA never did, no one can seriously contest that the ICA envisioned these settlement statements as part of complying with their deal. And when the parties signed the ICA, they did so, not on a blank slate, but on the basis of their ongoing course of conduct over nine months of disclosure through settlement statements.

This doesn't mean they were part of the ICA. The ICA was a standalone and independent agreement to be sure, but even as Mr. Porter concedes, he knew about the charges and their amount (save the upcharge on the one fine). He testified that he "was aware of" most of the deductions [75-1 Tr. 84], and the settlement statements he received weekly support that idea [75-4]. Mr. Porter testified that, "You know what your deductions are pretty much weekly" [75-1 Tr. 84]. So does the fact he received those settlement statements for months before signing the ICA. These settlement statements seem to have reflected each charge, and Mr. Porter would have been free at any time to seek an injunction barring T&T from continuing to take undisclosed deductions, 49 U.S.C. § 14704(a)(1), but he didn't.

Today he could seek actual damages, but he never explains in briefing how any regulatory violation caused him actual damages. *See Fox*, 839 F.3d at 1219. Mr. Porter can only point to a single charge that surprised him—"an overweight ticket one time" he believes resulted in an overcharge [75-1 Tr. 84]. Even then, he noted that it was on his settlement statement [*id.* Tr. 87]. He stops short of demonstrating that this charge harmed him because of a regulatory violation; instead, he hints at the kind of restitution not available under the Act. *Landstar Sys.*, 622 F.3d at 1324. To the extent it may have violated his contract, he may seek relief under a contract theory

so long as the breach caused this damage, but he never adduces any evidence that a regulatory violation resulted in this damage—and that is what the statute requires. 49 U.S.C. § 14704(a).

Mr. Porter also cites *Brant*, 43 F.4th at 680, but there the plaintiff alleged that the company withheld money in an escrow account and failed to return it after termination. That, the court determined, was sufficient to plead (not prove) actual damages. *Id.* That isn't the case here. Mr. Porter doesn't claim T&T withheld money in escrow after he ended his service. He only circles back to the violations, but a regulatory violation alone doesn't prove damages.

The court likewise favors the agreed approach of the circuit courts of appeal (Ninth Circuit, Tenth Circuit, and Eleventh Circuit) rather than *Brinker v. Namcheck*, 577 F. Supp.2d 1052, 1063 (W.D. Wis. 2008). Though *Brinker* at one point defines the "proper measure of damages" as "the exact amount defendant overcharged or withheld for each violation," in truth the case involved nonpayment of amounts due for the final two weeks of work and other outstanding amounts, including a duplicative charge of a tax the plaintiff had already paid—not undisclosed charges or computations. *Brinker,* 577 F. Supp.2d at 1055-57, 1062-63.

Mr. Porter hasn't established that T&T owes him outstanding payments, nor has he shown that the company double-charged him for anything. He knew about all the charges, if not in advance, then certainly by the time of the settlement statements. It seems he seeks restitution for or disgorgement of the charges in the settlement statements not specifically disclosed in the lease, but that isn't available to him. He has not really tried to meet his burden, nor really "posit a theory" of how he would be entitled to damages. *Fox*, 839 F.3d at 1219. Because Mr. Porter has failed to establish any actual damages, either for the nine months before the ICA or the period

he was operating under it, his claims under the truth-in-leasing regulations fail. *Id.*; *see also Brant*, 43 F.4th at 679 (must have damages for a claim under 49 U.S.C. § 14704(a)(2)).

Indeed, without that demonstrable harm, he lacks standing. "Congress' judgment that there should be a legal remedy for the violation of a statute does not mean each statutory violation creates an Article III injury." *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 727 (7th Cir. 2016); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). The United States Constitution confines the federal judiciary's power to "Cases" and "Controversies." U.S. Const. art. III § 2. For a case or controversy to exist, a plaintiff must have standing—an injury, fairly traceable to the defendant's conduct, that the court's decision will likely redress. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 285 (2021); *Spokeo*, 578 U.S. at 339.

Mr. Porter must be able to point to a "concrete" injury in fact that "actually exist[s]." *Spokeo*, 578 U.S. at 340. The plaintiff's injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S 167, 180-81 (2000) (citation omitted). He "must demonstrate standing for each claim that [he] press[es] and for each form of relief that [he] seek[s] (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). A "litigant who never supplies evidence of injury lacks standing to sue." *Thomas*, 2025 U.S. App. LEXIS 6699 at 7. Such is the case here for these truth-in-leasing regulations. The court accordingly must grant summary judgment on these regulatory claims for lack of a justiciable controversy (jurisdiction). *See TransUnion*, 594 U.S. at 431.

B. *Indiana Business Opportunity Act (Count 2 against Both Defendants).*

Mr. Porter next claims that T&T violated Indiana's Business Opportunity Transactions Act. Ind. Code §§ 24-5-8-1 *et seq.* When a seller solicits others to invest in a business opportunity, Indiana law requires the seller to make certain written disclosures, sign a written contract, maintain a complete set of books and records, and register with the state consumer protection division. Ind. Code §§ 24-5-8-2 to -7. Remedies for a violation can include cancellation of the contract, the return of all consideration paid to the seller (only within a year), actual damages, attorney fees, and injunctive relief. Ind. Code §§ 24-5-8-15 to -18. An investor cannot be forced to waive rights under this remedial statute. Ind. Code §§ 24-5-8-8 to -9.

For the BOTA to apply, the Driving Opportunity Program must meet the statutory definition of a "business opportunity"—namely, "an investment that . . . [i]nvolves an initial payment by the investor of more than five hundred dollars ($500) and an initial cash payment of less than fifty thousand dollars." Ind. Code § 24-5-8-1.[4] A "seller" includes a company who offers to sell or lease a business opportunity, and an "investor" means the person who becomes obligated under a contract. Ind. Code § 24-5-8-1. The parties debate whether an "initial payment" of $500 occurred, and the BOTA defines this as "the total amount an investor is obligated to pay under [the contract] before or at the time of delivery of the goods or services to the investor or within six (6) months of the date that the investor commences operation of the business." Ind. Code § 24-5-8-1.

T&T tenders an affidavit from its owner that Mr. Porter never made an "initial investment" in this program [63-12 ¶ 6], but the company offers this evidence without ever once

---

[4] The BOTA contains other definitions of "business opportunity," but no one argues their application here.

19

citing, much less wrestling with, the statutory definition of "initial payment." As counterevidence, Mr. Porter argues that he made weekly payments, when possible, toward his obligation on the truck and trailer (for instance, $880.75 according to the first February 29, 2020 settlement statement) [75-4 at 2].

T&T never replies to this point, and it would seem distorted to say his designated payments for the truck and trailer within the first six months cannot qualify because they were mere "deductions" from his compensation and not "initial payments" toward his contractually-extended credit for the truck and trailer. No partner in a law firm, and no investor in a real estate development company, just as examples, would say they made no initial payments toward their capital account or ownership interest merely because the firm or company deducted their payments from ongoing salary or equity. The deductions are payments on the business's credit, and BOTA seems not to draw another distinction under its plain terms.

The court recognizes that the ICA had not been signed at the time (it was only signed nine months later), but no one suggests that the parties lacked a contract between them, and BOTA defines "contract" broadly. Any contract would be informed by those terms mutually understood to frame their relationship, and not least the settlement statements. These settlement statements explained, as between these parties, that Mr. Porter had an obligation to make 192 payments of $695.71 toward the truck and 144 payments of $185.04 toward the trailer. He made such payments in the first six months. T&T's argument thus fails by not working within the statutory definition of "initial payment"—namely one a reasonable jury could use to find a business opportunity within the meaning of Indiana law. *See* Ind. Code § 24-5-8-1.

With no real development, the defense also alludes to an exemption within BOTA—that, whatever the definition of the business opportunity, the statute excludes "[t]he sale of any assets (other than inventory) of an ongoing business by the owner of the business." Ind. Code § 24-5-8-1. In pitching the argument, T&T omits the last phrase—*by the owner of the business*—and therein lies the rebuttal to its own undeveloped point. No one suggests here that the company's owner (Thomas Halleck), as opposed to T&T, either initially or later in the ICA expressly, sold the truck and trailer to Mr. Porter. Accordingly, a reasonable jury could find that this program constituted a business opportunity within BOTA's meaning.

More than a year has passed to eliminate Mr. Porter's right to void the contract, and he has no standing to cancel the contract or to seek an injunction when he no longer participates in this program.[5] That leaves then his right to recover "actual damages" (including attorney fees) because T&T failed to comply with the BOTA or breached its contract. *See* Ind. Code § 24-5-8-17 (noting either event can give rise to damages under BOTA). Even if barely, the record permits a reasonable jury to find actual damages, so T&T argues incorrectly that Mr. Porter lacks standing for this claim (as well as a statutory remedy).

Mr. Porter argues harm and cites just two examples—only one of which qualifies. First, Mr. Porter testified that he received less than 90 percent of the load charge after deductions [75-1 Tr. 65], but he never explains why this violated the lease or any other law, and instead admitted he "can't even remember" the violation or overcharge to state or measure any actual harm [*id.*]. A lack of memory cannot create a genuine triable issue, and his statement of material facts adds

---

[5] Nowhere in the complaint filed July 23, 2021, or in any other writing on this record, did Mr. Porter even try to void the contract either.

no other details. He cites only the complaint for deductions he disputes [75 ¶ 23], but one cannot rest merely on the pleadings at summary judgment. *See Van Diest Supply Co. v. Shelby Cnty. State Bank*, 425 F.3d 437, 439 (7th Cir. 2005).

Second, though Mr. Porter confessed he knew about most deductions, one arose from an apparent upcharge to a DOT fine [75-1 Tr. 83-84]. Of course, the ICA obligated Mr. Porter to pay all fines imposed by the DOT [63-11 § E(2)(e)], but nothing in the lease permitted T&T to assess an upcharge for such a violation (at least nothing the company identifies today). Mr. Porter testified that T&T charged him $1,000 for an overweight ticket from the DOT that exceeded the actual fine. T&T offers no explanation for why such an overcharge, if indeed it occurred, was not an actual harm to Mr. Porter. To be clear, this survives because BOTA covers not only its own violations, but any breach of the contract. *See* Ind. Code § 24-5-8-17.

Mr. Porter argues no other damages under BOTA. After all, though he testified that he received less money than he expected in his paychecks [75-1 Tr. 83], in each instance he never explains in his testimony or on this record how any shorted payment resulted from a breach of BOTA or the ICA—save this one. Accordingly, the court denies summary judgment on the BOTA claim to the extent of this upcharge and its associated attorney fees.

C.   *Indiana Wage Payment Statute (Count 3 against T&T).*

Mr. Porter next brings a claim against only T&T under Indiana's Wage Payment Statute. Ind. Code § 22-2-6-2. The statute prohibits any wages from being deducted from an employee's pay unless the deduction is signed by the employee and is for one of eighteen statutorily specified purposes. Ind. Code §§ 22-2-6-2(a)(1)(B), (b). T&T argues that Mr. Porter cannot bring this claim

because he was an independent contractor, not an employee. Mr. Porter argues that he was clearly an employee or alternatively that genuine triable issues preclude summary judgment.

Under Indiana law, "[w]hether one acts as an employee or an independent contractor is generally a question for the finder of fact," but "[i]f the significant underlying facts are undisputed . . . the court may properly determine a worker's classification as a matter of law." *Moberly v. Day*, 757 N.E.2d 1007, 1009 (Ind. 2001). Indiana uses a ten-factor test to analyze whether an individual is an employee or independent contractor. *Id.* at 1009-10. The designation in a contract may be different than the employee's actual status if enough of an employee-employer relationship exists. *Mortgage Consultants v. Mahaney*, 655 N.E.2d 493, 496 (Ind. 1995).

As factors, the law examines "(a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business." *Moberly*, 757 N.E.2d at 1010. This is a holistic analysis, and "no single factor is dispositive." *Id.*

The parties agree on five factors. Four weigh in favor of finding Mr. Porter to be an independent contractor. Both sides agree that commercial truck driving requires special skills and

certifications, including a commercial driver's license (CDL). *See Walker v. Martin*, 887 N.E.2d 125, 132 (Ind. Ct. App. 2008). Both sides agree that the ICA outlined a finite timeline. Everyone agrees that T&T paid Mr. Porter by load, not time spent working. *See id.* at 133 ("Sporadic payments in lump sum amounts for each job performed, instead of payments by the hour or on a weekly basis are more typical of an independent contractor than an employee."). Mr. Porter signed an agreement titled, in all capital letters, "Independent Contractor Agreement" [63-11], so concedes that this factor weighs in favor of finding him to be an independent contractor. And the parties also agree that the tenth factor—that T&T is a business—favors Mr. Porter's employee status. The court thus addresses the disputed remainder.

      1. *Control.*

Though no single factor is determinative, "the right to control the manner and means by which the work is to be accomplished is the single most important factor in determining the existence of an employer-employee relationship." *Pfadt v. Wheels Assured Delivery Sys.*, 200 N.E.3d 961, 972 (Ind. Ct. App. 2022) (quoting *Wishard Mem. Hosp. v. Kerr*, 846 N.E.2d 1083, 1090 (Ind. Ct. App. 2006)). Independent contractors generally control task "methods and details" and are "answerable to the principal as to results only." *Id.* Employees, in contrast, are subject to another's control or right to control. *Walker*, 887 N.E.2d at 131.

Mr. Porter seeks to draw parallels between his case and *Pfadt*, 200 N.E.3d at 973-74. Among other factors, in *Pfadt*, the driver received a manifest from Wheels Assured containing an order of deliveries he often followed exactly. *Id.* at 974. The manifest sometimes included "turn-by-turn instructions," and the driver had to note issues and the exact time he made each required stop in the manifest. *Id.* The driver also had a deadline for his deliveries. *Id.* at 973. A completed

24

manifest and any undelivered packages had to be returned to Wheels Assured at the conclusion of each shift. *Id.* With the manifests in the summary judgment record, the court found a jury question on this factor. *Id.* at 974.

Nothing like those detailed mandates or strict documentation requirements are present on this record. The undisputed evidence shows that Mr. Porter could accept or decline loads, and T&T never required him to take any job [63-13 Tr. 111; 63-12 ¶ 7]. He could take any route he wanted [75-1 Tr. 121]. He controlled his hours, to the extent allowed by the DOT [*id.* Tr. 121-22]. Mr. Porter was responsible for picking up his own loads [63-11 §§ E, F]. These undisputed facts would not permit a reasonable jury to favor finding Mr. Porter an employee rather than an independent contractor. *See Walker*, 887 N.E.2d at 131-32.

To be sure, T&T used a tracking device (called GeoTab) to comply with DOT requirements [75-2 Tr. 127]. This was connected to a tablet, and drivers were supposed to log into the tablet and note certain information (*e.g.*, whether they were carrying a load or were empty) [*id.* Tr. 127-28]. The tablet also tracked hours of services [*id.* Tr. 129]. Drivers received documents with instructions on the electronic logging system and how to complete paperwork [*id.* Tr. 32]. Such general information in compliance with DOT requirements differs markedly from controlling precise deliveries, delivery times, and routes or reporting issues with deliveries at the end of each shift with a completed manifest. *See Pfadt*, 200 N.E.3d at 973-74. Mr. Porter updating T&T whether he even chose to carry a load, on a route he selected, on a schedule that he directed, and doing so to comply with regulatory requirements set by a federal agency, reflects his independence rather than his control by T&T.

Mr. Porter briefly mentions that Mr. Halleck testified that T&T provided every driver with an employee handbook [75-2 Tr. 30-31]. This could be significant, but the court doesn't have the handbook in the record to see what it requires. Mr. Halleck testified that he would guess it is between 20-25 pages and he believes it is given to every employee [*id.* Tr. 31]. He couldn't say exactly what was in it, but he thought it was similar to the DOT safety training manual and instructions on securing loads safely [*id.* Tr. 29-32]. Nothing else in the record provides more information. Mr. Porter doesn't mention it. From the information in the record, the handbook appeared to be basic safety information; and without more, no jury could speculate that its terms alter the record today or the amount of control T&T might exert over the drivers.

Mr. Porter also argues that the ICA gave T&T "exclusive possession, control, and use" of the truck and trailer [63-11 § F(1)]. Federal truth-in-leasing regulations mandate this language. 49 C.F.R. § 376.12(c). In 1992, following a circuit split on whether this language created a presumption of employment, the ICC amended the regulation and added (c)(4), which reads, "Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements." 49 C.F.R. § 376.12(c)(4). The ICC explained that it added this language to correct a trend in some courts and agencies to consider the language as "evidence of an employer-employee relationship." *Petition to Amend Lease & Interchange of Vehicle Reguls.*, 8 I.C.C.2d 669, 671 (1992). The ICC wanted to reinforce its view "of the neutral effect of the control regulation" on the employer-employee analysis. *Id.* In short, it alone doesn't create a presumption of employment. *See Thomas v. Johnson*

*Agri-Trucking*, 802 F. Supp.2d 1242, 1247-49 (D. Kan. 2011). Accordingly, Mr. Porter has not adduced evidence permitting a reasonable jury to find the level of control necessary to view him as employee rather than independent contractor.

      2.   *Distinct Occupation or Business.*

A truck driver often is engaged in a "distinct enough occupation to weigh at least slightly in favor of independent contractor status." *Moberly*, 757 N.E.2d at 1011. On this record, this factor favors Mr. Porter's independent contractor status even more because he performed the same type of work for other companies. *See Pfadt*, 200 N.E.3d at 974; *Walker*, 887 N.E.2d at 132. According to his deposition, he worked for a carrier called Swift Transportation from 2017-2020 in which he began as employee only to later sign up for a lease-purchase; and he then worked for Truck for Loads (leasing a truck) and remained there during the time of his deposition in 2023 [75-1 Tr. 139-40]. Although driving for a single employer on a full-time basis may help create a question of fact, *Pfadt*, 200 N.E.3d at 974-75, the record today keeps this squarely within *Moberly*.

      3.   *Kind of Occupation.*

Commercial truck driving is "generally performed by a specialist without supervision." *Carroll v. Kamps*, 795 F. Supp.2d 794, 808 (N.D. Ind. 2011). The need for a specific license (CDL), the oft-independence in operations, and hours alone support this. Mr. Porter urges a return to *Pfadt* to conclude that a triable fact issue arises because of T&T's control, but this mixes concepts. And *Pfadt* concerned a small parcel delivery—a job that generally requires less by way of specialization than commercial trucking. *Pfadt*, 200 N.E.3d at 975. No reasonable jury could find that this factor weighs in favor of finding Mr. Porter to be an employee.

4. *Instrumentalities of Work.*

This factor asks "whether the employer or the worker supplied the instrumentalities, tools, and place of work." *Walker*, 887 N.E.2d at 133. "This factor cuts toward employee status if the employer provides tools or instrumentalities of substantial value, and it points toward independent contractor status if the workman provides the items." *Pfadt*, 200 N.E.3d at 976.

T&T points out that the ICA says Mr. Porter had title to the equipment [63-11 § A ("Independent Contractor represents and warrants that Independent Contractor has title to or is authorized to contract the equipment and services to [T&T]")]. Mr. Porter counters that the ICA also says the "equipment shall be for Carrier's exclusive possession, control, and use for the duration of this agreement" [*id.* § F(1)]. He also cites another contract provision that permitted T&T to "place and maintain on the equipment [T&T's] name and any lettering, advertising, slogans or designs as [T&T] may choose" [*id.* § F(3)] to draw a parallel to *Pfadt*, 200 N.E.3d at 976. He argues that these provisions create a triable issue.

The court disagrees. According to the ICA, the only reason for the equipment exclusivity provision is compliance with federal regulations: "This subparagraph is set forth solely to conform to Interstate Commerce Commission regulations and shall not be used for any other purposes, including any attempt to classify Independent Contractor as an employee of Carrier" [63-11 § F(1)]. Mr. Porter offers no cogent reason to depart from his express agreement. It allows for no more control for T&T than the law requires; and, if this language's presence made a driver an employee each time, then all companies complying with truth-in-leasing regulations would have employees, not independent contractors. And, in reality, Mr. Porter could under the agreement and did in practice carry cargo for others.

Under the second provision, T&T could place advertising and slogans of its choosing, but the ICA permitted Mr. Porter to "remove such identification at the termination of this agreement or while operating such equipment for any purpose other than conducting Carrier's business" [*id.* § F(3)]. This provision thus authorized T&T's advertisement for purposes of its loads, but likewise maintained Mr. Porter's independence to operate the truck and trailer—without such insignia—when he chose to transport cargo for another company.

As a helpful comparison, in *Walker*, 887 N.E.2d at 133-34, the court evaluated the relationship between a trucker and a company that dealt in timber and concluded that the company asking the trucker to remove the company's logo from his truck weighed in favor of independent contractor status. Mr. Porter's situation, logo-on-while-working and removed-while-independent, is similar to *Walker* in the latter sense. Mr. Porter could use the equipment for non-T&T work, and he had sole title to the truck and trailer—in a sense provided on credit by T&T, but in reality his from the beginning of the relationship. Like *Walker*, Mr. Porter paid for all maintenance, fuel, and insurance. *See id.* An allowance for T&T to advertise on the trailer while in service to this carrier may show that T&T provided such advertising, but not the company provided the equipment or tools of work. No reasonable jury could find that this factor weighs in favor of employee status.

5. *Regular Business of Employer.*

When a company is in the business of providing the service at issue, this factor weighs in favor of finding employee status; but when a service is ancillary to the business, this factor weighs strongly in favor of independent contractor status. *Family Christian World, Inc. v. Olds*, 100 N.E.3d

277, 285 (Ind. Ct. App. 2018). "If the employed person is being used to further the business of the employer, this factor weighs in favor of employee status." *Pfadt*, 200 N.E.3d at 977.

T&T says that physically hauling cargo isn't part of its business; instead, it says it arranges for cargo transport, distinguishing it from the work that Mr. Porter performed, the actual delivery. Mr. Porter argues that T&T characterizes its own business as "the commercial transportation of cargo" [63-9 ¶ 3]. T&T's argument draws too fine a line. No reasonable jury could conclude that Mr. Porter's service in driving a truck and trailer and hauling cargo falls meaningfully outside T&T's primary business. A reasonable jury could accept this factor as favorable to a finding of employee status.

6. *Conclusion.*

In the end, a reasonable jury would have, at most, scant evidence suggesting Mr. Porter is an employee. Eight factors, including the most important (control), a reasonable jury would be compelled to see as establishing Mr. Porter as an independent contractor. This would align with the clear expectations of the parties expressed in the ICA. The mere fact that T&T is a business (one factor) and the mere fact that Mr. Porter performed a service within the company's business model (a second factor) aren't sufficient, on this negligible record in its entirety, to convert an independent contractor to an employee. Indeed, these two factors would not be unusual to find in many independent contractor relationships, but they would not singlehandedly indicate an employer-employee relationship, even taking all reasonable inferences in favor of Mr. Porter based on the evidence on all factors. No reasonable jury could see it otherwise. The court recognizes that the parties focus on the ICA. No one argues that the parties acted in any way differently before the ICA, so the court views the nine months prior to the ICA as consistent for

30

purposes of summary judgment. Because Mr. Porter wasn't an employee, but an independent contractor, he isn't protected under the Indiana Wage Payment Statute, so the court grants summary judgment for T&T on this count.

D. *Fair Labor Standards Act (FLSA) (Count 4 against Both Defendants).*

Mr. Porter sues T&T for violating FLSA, 29 U.S.C. §§ 201 *et seq.*[6] For FLSA to apply, a plaintiff must be an "employee." 29 U.S.C. § 206(a). FLSA defines an employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). This is a broad definition. *Sec'y of Labor, United States Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987). The "determination of a workers' status is a legal rather than factual one." *Id.* at 1535 (citing *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206 (7th Cir. 1986)). The court must look beyond the contract's meaning and employ a six-factor test to determine "whether economic reality indicates a worker is an employee" under FLSA. *Brant*, 43 F.4th at 665.

These factors include "(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending on his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; (6) the extent to which the service rendered is an integral part of the alleged employer's business." *Lauritzen*, 835 F.2d at 1535. The court analyzes the totality of the circumstances; "[n]o single factor is necessarily controlling." *Brant*, 43 F.4th at 665. The parties

---

[6] Again on this count, the court refers to the defendants collectively as T&T.

agree that two factors—the finite duration and the special skill required—both favor independent contractor status and argue the remaining four factors.

   1.   *Nature and Degree of Employer's Control.*

"One way to understand this factor is to ask whether the worker has control over such a meaningful portion of his labor that he operates as a separate economic entity, i.e., as an independent contractor." *Id.* at 666. Significant monitoring and a "lack of genuine control over the conduct of his work" would weigh in favor of finding Mr. Porter to be an employee. *Id.* As discussed, Mr. Porter controlled the loads he elected to take, his routes, and his hours. T&T did not tell him "how to pick up and deliver loads," how to hire extra help, or require that he "adhere to detailed standard operating procedures." *Id.*

As the only addition to this federal analysis, Mr. Porter points to T&T's ability to levy fines on its drivers for not complying with rules [75-2 Tr. 108-09], citing *Miller v. SBK Delivery, LLC*, 2024 U.S. Dist. LEXIS 37190, 19 (S.D. Ohio Mar. 4, 2024). There, the ability to discipline (terminate in that case) was the fifth fact the court cited for determining that a triable issue existed on this question of control (along with the drivers having little control over their schedules or choosing deliveries and routes). *Id.* at 17-18. Here, T&T implemented a fine system after a DOT audit (and resulting large fine) because DOT determined there needed to be penalties for safety violations. This policy evinces some control, though from this record control largely by DOT mandate. The record leaves silent what control these fines effected or even whether T&T elected to impose any such fine on Mr. Porter. Without evidence of monitoring or control, Mr. Porter's retained decisionmaking about when and how to work weighs against an employer-employee relationship under FLSA.

2.    *Opportunity for Profit or Loss.*

The central question under this prong, which "gets to the heart of the economic relationship," is "the degree to which [Mr. Porter's] opportunity for profit or loss depended upon his managerial skill." *Brant*, 43 F.4th at 668. T&T says Mr. Porter was paid by the job, that he was free to accept or decline any loads [63-13 Tr. 111], that T&T never demanded he haul a load he declined [63-12 ¶ 7], and that he was told from the beginning that he could make as much as $2,000 a week or as little as nothing per week, at his choice [75-2 Tr. 80]. Mr. Porter argues that nothing shows he could increase his profit based on his managerial skill because 80 percent of his loads came either through his dispatcher or the main office [75-1 Tr. 108].

Mr. Porter agrees that he was paid by the load [75 ¶ 31] and that he could choose the loads [*id.* ¶ 24; 63-13 Tr. 111]. Nearly by definition, how he managed his time and how he selected opportunities affected his total compensation. That T&T's dispatcher presented these opportunities to him most of the time doesn't the alter the fact that he could control his profit or loss based on how he managed his independent load decisions. Indeed, by his admission, 20 percent of his loads came from elsewhere, so he necessarily had other ways to secure loads and remuneration [75-1 Tr. 107-08]. Mr. Porter says the load's quality and price (*vis-à-vis* mileage or a "permit load") were most important in increasing profit, so he could choose those that maximized his return [*id.* Tr. 61-62, 108]. This factor clearly weighs in favor of an independent contractor status.

3.    *Employee's Investment in Equipment or Materials.*

This factor considers "potential investment in equipment or materials." *Brant*, 43 F.4th at 670. This "capital investment factor is interrelated to the profit and loss consideration." *Lauritzen*,

835 F.2d at 1537. Essentially, the law looks to who put money into the necessary tools or supplies for the job. A "worker who makes a large-of-pocket investment in his job is more likely to be an independent contractor than an employee." *Howard v. Dollar Tree Stores, Inc.*, 2024 U.S. Dist. LEXIS 176264, 12-13 (N.D. Ill. Sept. 28, 2024) (quotations omitted) (factor weighed in favor of independent contractor relationship when a security guard provided his own baton, handcuffs, gun, and bullet proof vest despite store providing the building and chair he sat on during his shift); *cf. Fares v. HB&H LLC*, 2023 U.S. Dist. LEXIS 103148, 13-14 (E.D. Wis. June 14, 2023) (factor weighed in favor of employee status when a company provided the poles, stage, and sound system and dancers paid only for their costumes and personal beauty products).

T&T cites the fact that Mr. Porter invested in the equipment here because he entered into a leaseback agreement with the company; and it claims that once Mr. Porter had title to the truck, he was free to do with it as he wished. Mr. Porter says he never had title to his truck or trailer, and he points out that the ICA gave T&T "exclusive possession, control, and use" of the truck and trailer [63-11 § F(1)].[7] But in Mr. Porter's words, "it's your truck. You're allowed to take any route you want" [75-1 Tr. 121].

Mr. Porter argues that his payments toward the truck and trailer were requirements to become a driver, not capital investments in his own business. This is quite a turnabout from his position on his BOTA claim that requires just such an investment in a business opportunity. In actuality, Mr. Porter made just such a capital investment in his business—acquiring title in the truck and trailer, making initial and ongoing payments toward this ownership, reserving the right

---

[7] As the court has already noted, this same paragraph was intended to comply with Interstate Commerce Commission regulations, as it clearly outlines.

to "provide all the equipment ready to operate and fully roadworthy" [63-11 § E(2)(a)], paying expenses and maintenance to maintain in clean appearance [*id.* §§ E(2)(a), F(3)], paying for insurance when the equipment was used for alternative carriers [*id.* F(4), App. B], and retaining the right to trip lease the equipment [*id.* § H]. These provisions explain that Mr. Porter had significant investment in the equipment.

In *Brant*, 43 F.4th at 670-71, the court of appeals concluded that a lease system whereby the driver leased the truck from the company with no down payment, no payment during the first weeks of work, and no out-of-pocket investment from the driver weighed in favor of employee status because it demonstrated the driver's total dependence on the company to operate, though under the agreement he was leasing the truck back to the company. Though Mr. Porter likewise made no down payment, he made significant investments in the equipment, albeit he did so entirely dependent on the T&T's credit to operate—for nearly 200 payments on the truck and over 140 on the trailer, quite aside from the credit extended to finance the various chargebacks under the ICA. Even assuming weekly payments, Mr. Porter would be paying the company to operate the equipment for years. Under *Brant*, this factor is more mixed but weighs slightly in favor of employee status.

4. *Service Rendered Integral Part of Alleged Employer's Business.*

As discussed, T&T is "engaged in the commercial transportation of cargo," and it relies on drivers like Mr. Porter to transport that cargo. This factor weighs in favor of employment. *See id.* at 672.

5.  *Conclusion*

Four factors weigh in favor of independent contractor status and two in favor of employee status. The analysis isn't simply counting score, but the totality of the circumstances weighs in favor of independent contractor status. Mr. Porter had specialized skill, chose his schedule, his routes, which loads to take, payment by the load, for a finite term. The degree of T&T's control was relatively slight. Mr. Porter, on the other hand, could maximize his return through choice selection of his loads from T&T and from his work with others. Although the company granted title to the truck and trailer to Mr. Porter for him to engage in their primary purpose of transporting cargo, he was responsible for all other maintenance of this equipment and he retained the choice to transport that cargo or not. These two factors, within the totality of the circumstances, don't outweigh his independence on this record. Mr. Porter wasn't an employee under FLSA, so the court grants summary judgment on this count.

E.  *Constructive Fraud (Count 5 against Both Defendants).*

T&T and Mr. Halleck request summary judgment on Mr. Porter's constructive fraud claim.[8] A constructive fraud claim "arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud." *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250 (Ind. Ct. App. 1998). "Any breach of duty arising from a confidential or fiduciary relation, whereby the party at fault without any actual fraudulent intent gains an advantage at the expense of any one to whom he owes such a duty, amounts to a constructive fraud." *Doe v. Howe Mil. Sch.*, 227 F.3d 981, 991 (7th Cir. 2000) (citing *Hall v. Ind. Dep't of State Revenue*, 351 N.E.2d 35, 38 (Ind. Ct. App. 1976)).

---

[8] The court refers to both as T&T for the purposes of this count.

Constructive fraud has five elements: "[1] a duty owing by the party to be charged to the complaining party due to their relationship; [2] violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; [3] reliance thereon by the complaining party; [4] injury to the complaining party as a proximate result thereof; and [5] the gaining of an advantage by the party to be charged at the expense of the complaining party." *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996); *accord Kapoor v. Dybwad*, 49 N.E.3d 108, 124 (Ind. Ct. App. 2015). "The types of statements that give rise to constructive fraud generally are misrepresentations or omissions of objective fact and occur during the business transaction rather than after it." *Mudd v. Ford Motor Co.*, 178 F. Appx. 545, 547 (7th Cir. 2006) (citing Indiana cases).

T&T argues that the court (through a prior presider on the motion to dismiss) already concluded that Mr. Porter failed to allege a relationship that gives rise to a duty of good faith and fair dealing under the Indiana Commercial Code and, from that footing, contends that a constructive fraud claim must fail. It adds that because Mr. Porter was an independent contractor under Indiana law, he cannot establish an employer-employee relationship for purposes of a constructive fraud claim. Mr. Porter argues differently—he says he has pleaded a claim under a buyer-seller relationship, citing *Wells*, 691 N.E.2d at 1251, and distinguishes the court's prior ruling as having no relationship to this constructive fraud claim.

The parties thus frame their dispute as one about the "special relationship" that constructive fraud requires in its first element. *Rice*, 670 N.E.2d at 1284. A plaintiff satisfies the burden to show a special relationship "when the parties have fiduciary duties to each other" (*e.g.*, between lawyer and client), *Comfax Corp. v. N. Am. Van Lines*, 587 N.E.2d 118, 125 (Ind. Ct. App.

37

1992), or some other confidential relationship or one where superior knowledge invokes a duty of good faith and fair dealing, *Kapoor*, 49 N.E.3d at 125. Mr. Porter was an independent contractor under Indiana law, so no employer-employee relationship gives rise to such a special relationship today. *See Yost v. Wabash College*, 3 N.E.3d 509, 518-19 (Ind. 2014) (principal-agent status creates fiduciary relationship).

Mr. Porter's claim thus hinges on whether an alleged buyer-seller relationship suffices to support this claim. Often a buyer-seller relationship, when two parties engage in arms-length negotiations that culminate in a contract, won't qualify as a fiduciary one. *See, e.g., Butler v. Symmergy Clinic, PC*, 158 N.E.3d 407, 414 (Ind. Ct. App. 2020); *Mullen v. Cogdell*, 643 N.E.2d 390, 401 (Ind. Ct. App. 1994); *see, e.g., Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 639 (Ind. Ct. App. 2015) (bank and customer-debtor lacked special relationship in their contract to support a constructive fraud claim). That said, Indiana "law recognizes that in a buyer-seller relationship one party may be in the unique possession of knowledge not possessed by the other and may thereby enjoy a position of superiority over the other." *Mullen*, 643 N.E.2d at 401. Such a relationship "invokes a duty of good faith and fair dealing." *Id.*; *see also Wells*, 691 N.E.2d at 1251 (based on pleadings); *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 324 (Ind. Ct. App. 1991) (constructive fraud when "a seller makes unqualified statements in order to induce another to make a purchase; the buyer relies upon the statements; and the seller has professed to the buyer that he has knowledge of the truth of the statements") (numbers omitted).

In truth, the parties spend no real time with the evidence and focus only on the pleadings—and, absent a pure question of law, that should be a warning sign for advocates arguing summary judgment. For the party opposing summary judgment (Mr. Porter), he cannot

rely merely on the pleadings at summary judgment, though he does. *See Van Diest*, 425 F.3d at 439. But in fairness, T&T frames its argument only based on the pleadings (until a slight pivot in reply), and that too misses the mark, for the time for that argument has long passed. *See Litsinger v. Forest River, Inc.*, 536 F. Supp.3d 334, 351 (N.D. Ind. 2021). To the extent that T&T tries to parlay Judge Jon DeGuilio's motion to dismiss ruling on the Uniform Commercial Code (UCC) concerning a duty of good faith and fair dealing into this constructive fraud claim on summary judgment, the company leaves wholly unaddressed the pleaded concealment of material facts that go above and beyond the pleaded bases for the UCC claim. In addition, the company never explains why, under the law or under the undisputed facts, it deserves summary judgment in total.

For today, though T&T has it right that Mr. Porter cannot pursue a constructive fraud claim based on an alleged state law employer-employee relationship, the company offers no rebuttal—much less in the evidence or in the law—to Mr. Porter's point that Indiana law permits a constructive fraud claim based on a buyer-seller (or perhaps even an investor-investee) relationship in which the seller or investment opportunist enjoys a superior position because of its withheld knowledge. To the extent the company asks the court to evaluate the pleadings at summary judgment to toss this claim, the court declines this argument as untimely (and easily deniable under Rule 12(b)(6)). Had the company engaged the evidence or offered another basis in the law for summary judgment, *cf. Am. Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 247 (Ind. Ct. App. 2010), Mr. Porter's failure to address such arguments with nothing but his pleading may have doomed the claim. But he met T&T where it framed its point. And the court remains confined to the arguments the parties make. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375-

39

80 (2020) (discussing party presentation rule). The court denies summary judgment on this claim accordingly.

    F.  *Breach of Contract (Count 6 against T&T).*

Mr. Porter also brings a breach of contract claim against T&T, alleging the company failed to pay him 90 percent of gross revenue as specified in the ICA.[9] "The essential elements of a breach of contract action are the existence of a contract, the defendant's breach [], and damages." *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021) (citation omitted).

The ICA specified that Mr. Porter would be paid 85 percent of gross revenue of the carrier's freight and 90 percent of the broker freight [63-11 App. A]. These served as base rates before expenses were "deducted from the amount of Independent Contractor compensation" [*id.* § L]. T&T argues that Mr. Porter hasn't presented any evidence that he wasn't paid the percentage specified in the ICA.

Here the record and briefing become far too lax. Usually at this point of summary judgment the parties can point to specific instances where one or the other breached specific provisions of the operative contract. Mr. Porter cites his pleading (inappropriately) and then one deposition answer that would tell the jury nothing important—for he just points to deductions without explaining why the ICA foreclosed such deductions, and he readily admits he just cannot remember the details. If at this point Mr. Porter cannot identify for a reasonable jury what specific paychecks involved the wrong base revenue or wrong deductions, then that same jury could not find for him. The mere fact—and this fact alone—that Mr. Porter received less than 90 percent

---

[9] This is the only breach of contract claim remaining after the court's ruling on the motion to dismiss.

isn't enough to show a breach, for the ICA permitted deductions from this base rate. Nor has Mr. Porter showed that T&T violated any contract in the nine months before the ICA.

On this record, a reasonable jury could find a breach only with respect to the one instance of the overcharged DOT fine. Save for that theory alone, the court grants summary judgment on the breach of contract claim.

G.   *Jurisdiction.*

Because the court grants summary judgment on the truth-in-leasing and FLSA claims, the only remaining claims are based on Indiana state law. That raises a jurisdictional question, and the court must "take[] jurisdictional issues seriously" and act as a "jurisdictional hawk," *Lowrey v. Tilden*, 948 F.3d 759, 760 (7th Cir. 2020). The parties initially pleaded jurisdiction based on a federal question, 28 U.S.C. § 1331, and under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2)(A).

"When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims[.]" *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010); *see, e.g., Contreras v. Suncast Corp.*, 237 F.3d 756, 766 (7th Cir. 2001). Certain exceptions exist, including when substantial judicial resources have been expended and when it is clearly apparent how a state claim is to be decided. *See Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007); *see also Van Harken v. City of Chi.*, 103 F.3d 1346, 1354 (7th Cir. 1997); *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994).

There may be another exception—a separate basis for jurisdiction. But Mr. Porter's complaint says only that he is a "resident" of Michigan and that Mr. Halleck is a "resident of

Indiana" [1 ¶ 10, 13]. Merely stating a person's residency isn't enough to establish citizenship for purposes of diversity jurisdiction, which depends on domicile—that is, "the state in which a person intends to live over the long run." *Heinen v. Northrop Grumman Corp.*, 671 F.3d 669, 670 (7th Cir. 2012); *see also Meyerson v. Harrah's E. Chi. Casino*, 299 F.3d 616, 617 (7th Cir. 2002). He also pleads all parties' citizenship based on information and belief, which is insufficient. *See Am.'s Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1074 (7th Cir. 1992); *see also Med. Assurance Co. v. Hellman*, 610 F.3d 371, 376 (7th Cir. 2010).

Before the court decides any retained jurisdiction, the parties must verify this independent basis for subject matter jurisdiction under CAFA. As the party seeking to invoke federal jurisdiction, Mr. Porter bears the burden. *See Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020). And though the court doesn't lose jurisdiction just because the damages turn out to be lower, *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 809 (7th Cir. 2017), the court has reasonable cause to wonder what the good faith basis was for pleading that this case involved more than $5,000,000 in damages under CAFA. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014); *Meridian Sec. Ins. v. Sadowski*, 441 F.3d 536, 541 (7th Cir. 2006).

The original class action motion is thus premature until jurisdiction is assured, and if nothing else may well need substantial revision given the scope of this summary judgment motion. Accordingly, the court will direct the parties to meet and confer and to file a joint statement on jurisdiction and to propose a case management plan on any proposed next steps.

CONCLUSION

Accordingly, the court GRANTS IN PART and DENIES IN PART the summary judgment motion [61]—namely, the court GRANTS summary judgment for the defendants on

all claims, except that the court DENIES summary judgment on count 2 (as to the DOT fine upcharge and related attorney fees only), count 5 (constructive fraud), and count 6 (contract claim based on the DOT fine only). The court DENIES the motion to certify a class [49] with leave to renew based on this ruling in the event of jurisdiction. The court ORDERS the parties to meet and confer and to file a joint notice by April 16, 2025 stating the facts establishing subject matter jurisdiction at the time of the case's filing and to propose an action plan for next steps, including any proposed dismissal to state court or retention of jurisdiction, any motion for class certification, or trial. In the event the parties cannot agree to the facts pertaining to jurisdiction as of July 23, 2021, or otherwise reach agreement on next steps, they may file separate statements not to exceed three pages on these subjects. The court GRANTS the motion to seal [53] and DIRECTS the clerk to seal Exhibits F and G [51, 52].

SO ORDERED.

March 26, 2025                          _s/ Damon R. Leichty_
                                        Judge, United States District Court